“Freedman, J.
This action is brought by the plaintiff, a theatrical and operatic manager, to restrain the defendant from appearing as a singer or actress upon the stage of the Casino, in the city of New York, during the period of her contract with the plaintiff.
“ A preliminary injunction having been granted, and it appearing, upon the hearing of the motion for the continuance of the injunction during the pendency of the action, that the defendant had made a contract in writing with the manager of the Casino, and had been extensively advertised to appear at that theatre within a few days thereafter, it was arranged between the parties, hut without prejudice to the rights of either, that the defendant upon giving an undertaking in the sum of $2,000, conditioned to pay that sum as liquidated damages in case it should be finally determined that the plaintiff is entitled to an injunction herein, might go on and fulfill her contract at the Casino.
“ The undertaking having been given, as agreed, and the rights of both parties having been expressly preserved, the fact that plaintiff’s contract with defendant has since that time expired, is not to be considered, and the case still calls upon the court to determine plaintiff’s original right to injunctive relief.
“ The material facts, as they appear from the pleadings and the evidence, are that by written contract the defendant agreed with the plaintiff to appear in the soprano roles of such operas as the plaintiff might produce during the seasons of 1887-8 and 1888-’9, and in such cities in the United States as he might select; that in the production of each opera the plaintiff was to supply the costumes; that in New York seven performances *82 were to be given each week, exclusive of Sundays; that each season was to commence in the month of October or November of each year and to last until May or June of the following year; that the plaintiff was to have the right to terminate each season by giving two weeks’ notice ; and that the defendant, for the faithful performance of her part of the said contract, was to receive the sum of $300 per week; that the defendant was and is an actress and singer distinguished in her profession and a great artistic acquisition both in name and dramatic and operatic service, to any theatre where comic operas are produced ; that the plaintiff, relying upon his contract, announced the defendant at large expense in the daily newspapers of this city and widely throughout the United States as a member of his company to the end of the season of 1889 ; that the defendant refused to perform in plaintiff’s opera which was produced at the Standard Theatre, in the city of New York, on Monday evening, January 7,1889, and which was to be continued for some weeks; that at that time the defendant had ■agreed to perform as an actress and singer at the Casino, ■a -rival of and competitor with the theatre, so far as the production of operas are concerned, which the plaintiff had engaged for his company, and had been announced with her 'consent to appear at the said Casino on Monday, January 14, 1889, and to continue to the end of the operatic season; that the plaintiff unsuccessfully protested against it; that it was not possible for the plaintiff to replace the defendant for the remainder of the season by any other actress and singer of equal repute; and that in consequence thereof the plaintiff was likely to, and in fact did, sustain irreparable damage. The proof, on the part of the plaintiff, that in this and other cities he did sustain large damages in consequence of defendant’s act, and that the extent of such damages cannot be accurately measured, is unusually clear and convincing.
*83 “ The facts so far referred to contain all the elements necessary to sustain, within the rule laid down in Daly v. Smith, 38 N. Y. Super. Ct., Rep. 158, and followed in several cases since that time, an injunction against defendant’s appearance at the Casino.
“ It, therefore, remains to be seen whether there is anything else in the case which calls for a different conclusion.
“The defendant’s counsel insists that, inasmuch as there is no negative stipulation in the contract by which the defendant agreed not to appear elsewhere, the court cannot interfere. But, as was shown in Daly v. Smith, supra, the court is bound to look to the substance and not to the form of the contract. As the defendant had agreed to appear in seven performances in each week (exclusive of Sundays) which the plaintiff’s company might give in New York, it was not possible for her to perform elsewhere in New York without a violation of her contract with the plaintiff, and a negative clause was unnecessary to secure to the plaintiff exclusively the services of the defendant.
“ It is also insisted that the contract is inequitable in its terms, because it provides that two weeks’ notice of the termination of the season might be given by the plaintiff. It did not enable the plaintiff to discharge the defendant on two weeks’ notice, but a notice of two weeks of the termination of the season was to be given. So long as the company remained together and performances Avere given, tire plaintiff was bound to pay to the defendant the $300 per week, provided the defendant fulfilled her part of the contract. By the pleadings it stands admitted that the season of 1888-’9 was to close at about June 1, 1889, and in point of fact the plaintiff by letter notified the defendant that the said season would terminate not before the middle of May, or June 1, 1889. The point is therefore untenable.
“And finally it is insisted that the defendant was *84 justified in breaking her contract with the plaintiff because the plaintiff had refused to substitute a more healthful costume for the tights in which the defendant had appeared in a certain opera, and the wearing of which she had objected to on the ground of danger to her health. It appears that the opera in question was called The Queen’s Mate.’ In this opera the defendant was to appear in a part which required her to wear tights. Before the production of the opera she was consulted by the plaintiff with regard to it, and informed that it would be necessary for her to wear tights, and she agreed that she would so appear. This has been admitted by her, but at the same time she claimed that she agreed to do so only during the summer. But in point of fact the plaintiff did appear in tights during cold weather and never claimed exemption by agreement during such weather, and inasmuch as the plaintiff had not only the right to prescribe the costumes but also the duty to furnish them, and no evidence has been adduced that the costumes of an opera change with the seasons of the year, or that the defendant ever claimed any right to such a change, I cannot find that the claim now advanced by the defendant in this respect has any foundation in fact. In point of fact the defendant did appear in this part and in tights for at least 150 nights, and from twenty to thirty chorus girls appeared in the same costume during each performance. Any change which might have been made in the costume of the defendant would have necessitated a corresponding change in the costumes of from twenty to thirty other persons.
“ The controversy is, therefore, narrowed down to the question whether the plaintiff so unreasonably insisted upon his rights under the contract to the detriment of the health of the defendant that, in equity and good conscience, the defendant was justified in breaking off her engagement. Upon a careful consideration of all *85 the facts and circumstances as disclosed by the evidence on both sides, I cannot find that he did. The defendant undoubtedly at several times caught cold, but the real cause has not been proved. When, in answer to her claim that the cold was caused by the wearing of tights, she was advised by her own physicians, who, however were not informed of the fact that she wore them only for about ten minutes during each performance, that she should wear something underneath them which would protect her, she refused at once, not because the plaintiff objected to it, but because in her judgment it would ruin her outlines to do so. In fact, she never discussed the matter with the plaintiff with a view to compromise the difficulty, if any there was. If she had done so, and had made an honest attempt to convince the plaintiff that the wearing of tights, for even so short a time, seriously affected her health or voice, it is reasonable to suppose that the plaintiff, who had a direct interest in her appearing as often as possible, would have met her half way. She made no such attempt.
“ But the proof in this case goes much further. It justifies the conclusion that this excuse of the defendant was in a great measure a mere pretense.
" It was shown by the testimony of Mr. Aronson and the plaintiff, and finally admitted by the defendant, that while the defendant played for the plaintiff in the city of Chicago, during the latter part of October, 1888, Mr. Aronson, manager of the Casino, communicated with her by telegram, offering her an engagement with his company. Thereafter Aronson went from New York to Chicago and had an interview with the defendant, without the knowledge of the plaintiff, and of which the latter was never informed. During that interview Mr. Aronson was informed by the defendant that she was at liberty to accept an engagement from the first day of May, 1889, but that she might be able to begin her engagement earlier, if it was in his power to make an *86 earlier engagement with her. From that time the defendant tried to bring about a change in her relations with the plaintiff. Up to that túne no difficulty had arisen concerning the wearing of tights. On Thursday, November 22, 1888, at the city of Philadelphia, the defendant addressed a note to the plaintiff, in which she said: 61 will leave on this coming Saturday night and rest two weeks. My voice shows wear, and as that is my first consideration, I must not trifle with it.’ At the same time she complained of having a cold, and with reference to that she said: ‘ I attribute my cold almost entirely to wearing tights, and you must arrange some other costume in place of them. I shall never appear in tights again.’ And in the same note she suggested a change of costume so great and radical as to necessitate, if an attempt had been made to carry it out, a change of the costumes of the entire company. Moreover, the proposed change involved great expense and great loss of time. This was the first distinct notice which, according to the testimony which I find worthy of belief, the plaintiff received as to the objection of the defendant to wear tights, and the defendant, without waiting for an answer or seeking an interview with the plaintiff, on Saturday, November 24, 1888, left Philadelphia and came to New York, and on the same day entered into a contract with Mr. Aronson to appear at the Casino. That contract, on its face, appears to have at first been made to commence May 6, 1889. It was subsequently altered to commence January 14, 1889. The defendant undertook to state that that alteration was not made until after the injunction had been granted in this case, but finally she conceded that it was probably before. Mr. Aronson declared that it was made at least as early as December 24, 1888. Defendant’s own communication, admitted to be in her handwriting’, dated December 24, 1888, states that she had made arrangements to play with Mr. Aronson at the Casino. That *87 contract made it her duty to give her services gratis at rehearsals for a period of four weeks prior to the commencement of her regular engagement at the Casino, and to furnish her own tights, wigs, shoes and stockings, but costumes and boots were to be furnished to her. A further circumstance of great significance is that on December 5, 1888, the defendant wrote to the plaintiff that she was ready and willing to assume her part, in the said opera in Boston for two weeks, and to appear in tights for that period, provided the plaintiff would pay her the additional sum of $150 per week. Other incidents might be referred to, but it is not necessary to go any farther. The conclusion is unavoidable that the excuse now advanced by the defendant for the breach of her contract with the plaintiff should not be sustained.
Howe & Hummel, attorneys and of counsel, for appellant.
Vanderpoes, Cuming & Goodwin, attorneys, and Henry Thompson of counsel, for respondent.
“ Upon the whole case, the plaintiff is entitled to judgment, with costs.”
Per Curiam.
Judgment affirmed, with costs, upon the opinion of the trial judge.