(86 Misc. Rep. 441)

### AMERICAN LEAGUE BASEBALL CLUB OF CHICAGO v. CHASE.

(Supreme Court, Special Term, Erie County.   July 21, 1914.)

1. INJUNCTION (§ 60*) — EQUITY JURISDICTION — EMPLOYMENT CONTRACTS — BASEBALL PLAYER.

Equity has jurisdiction to enjoin a baseball player from violating an implied or express contract that he would not work for another during a specified term, where it appears that the player's services are of a unique, unusual, and extraordinary character, and that a substitute could not readily be obtained who would substantially answer the purpose of the contract.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 117–119; Dec. Dig. § 60.*]

2. CONTRACTS (§ 10*)—MUTUALITY—INJUNCTION AGAINST BREACH.

Where a contract employing a baseball player was subject to a national agreement between clubs constituting the American major and minor leagues and the rules and regulations of the National Commission, under which a provision of the player's contract, that $1,500 of his salary was a consideration for an option reserved to the employing club to contract for the exclusive right to the player's services for the succeeding year, required him to renew his contract with the employing club for the succeeding year or abandon his vocation as a baseball player, and prohibited him from obtaining employment in any other club without the employing club's consent, while it could terminate the contract and all obligations thereunder on 10 days' notice to the player, such contract, in so far as it bound the player to renew, was unenforceable in equity for want of mutuality.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 21–40; Dec. Dig. § 10.*]

3. MONOPOLIES (§ 12*)—ORGANIZED BASEBALL—SHERMAN ANTI-TRUST LAW— "COMMERCE"—"COMMODITY."

The National Agreement between organized baseball leagues in the United States and the rules and regulations of the National Commission, though constituting a monopoly of baseball as a business in the United States, are not within the Sherman Anti-Trust Law (Act July 2, 1890, c. 647, 26 Stat. 209 [U. S. Comp. St. 1901, p. 3200]), prohibiting monopolies of trade and commerce, the term "commerce," as used in such act, meaning an interchange of goods, merchandise, or commodities in trade carried on by transportation between different countries, and the term "commodity," meaning that which is useful or serviceable, particularly an article of merchandise movable in trade, which does not include baseball, a mere amusement or sport.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*

For other definitions, see Words and Phrases, vol. 2, pp. 1287–1298; vol. 8, pp. 7606, 7607; vol. 2, pp. 1309, 1310.]

4. CONTRACTS (§ 103*) — LEGALITY — COMMON-LAW MONOPOLY — BASEBALL LEAGUES.

An association of the major and minor baseball leagues in the United States adopted a national agreement and rules and contracts subsidiary thereto, by which a combination of 40 leagues was formed under the

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

terms of the agreement which controlled for profit the services of 10,000 players of professional baseball, including practically all the skillful players in the country. The agreement and rules not only controlled the services of the players, but provided for their purchase, sale, exchange, draft, reduction, discharge, and blacklisting, placing them under a species of quasi peonage preventing them from obtaining employment as players except in accordance with the rules of the association, which gave a club once employing a player a right to compel him to continue to play for it or surrender his vocation. *Held*, that such association constituted a monopoly in contravention of the common law, invading the right to labor and contract as a property right, and was a combination restraining and controlling the exercise of a profession and calling; and hence the claim of a club to the exclusive right to the services of a player with whom it had contracted, under his contract reservation in accordance with such rules and regulations, would not be enforced in equity.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 468–476; Dec. Dig. § 103.*]

Suit by the American League Baseball Club of Chicago against Harold H. Chase. On motion by defendant to dissolve a temporary injunction. Granted.

Dirnberger & Augspurger (Keene H. Addington, of Chicago, Ill., Edward E. Gates, of Indianapolis, Ind., M. F. Dirnberger, Jr., and Owen B. Augspurger, both of Buffalo, of counsel), for the motion.

Moot, Sprague, Brownell & Marcy, of Buffalo (Ellis G. Kinkead, of Cincinnati, Ohio, Adelbert Moot, Wm. L. Marcy, John W. Ryan, and Helen Z. M. Rodgers, all of Buffalo, of counsel), opposed.

BISSELL, J. The defendant moves for an order dissolving the temporary injunction, pendente lite, heretofore and on the 25th day of June, 1914, granted in this action, which has been brought by the plaintiff to restrain the defendant from playing baseball for any one other than the plaintiff during the period of defendant's contract with the plaintiff.

The determination of the questions raised on the motion involves a careful analysis, not only of the player's contract, the breach whereof by the defendant is admitted, but also of the so-called National Agreement and the Rules of the National Commission, adopted pursuant to the National Agreement, which are connected with the Player's Contract, and evidence the general plan or scheme under which the defendant was employed by the plaintiff.

The game of baseball, which began as an athletic sport of youthful players attending the schools and colleges throughout the country, has continued as the favorite athletic sport of America during the past half century, and has been commercialized and organized as professional baseball and developed into a big business conducted for profit under the name of "Organized Baseball."

The National Agreement for the government of professional baseball, together with the Rules of the National Commission, present to the court the scheme of co-operation and management of baseball leagues and baseball clubs and the control of baseball players.

The defendant, Chase, signed with the plaintiff the Player's Contract, as prescribed for the American League of Professional Baseball

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Clubs by the National Commission; and on the 15th day of June, 1914, gave notice in writing to the plaintiff of his intention to avoid, cancel, and annul the agreement entered into by him with the plaintiff on the 26th day of March, 1914. Thereafter and on the 20th day of June, 1914, he entered into a contract to play baseball for a rival club, to wit, the Buffalo Club of the Federal League.

[1] It is a well-established general rule that equity will not specifically enforce a contract of service, either directly by means of a decree directing the defendant to perform it, or by an injunction restraining the defendant from violating it, except in cases where services contracted for are of a special, unique, and extraordinary character, and a substitute for the employé cannot readily be obtained who will substantially answer the purpose of the contract.

Injunctions in behalf of an employer against an employé to restrain the latter from violating an implied or expressed covenant that he will not work for another, upon the ground that the employé's services are of a unique and unusual character, have frequently been granted since the leading case of Lumley v. Wagner, 1 De Gex. M. & G. 604, and the fundamental rules governing their issuance may be said to be well settled. 3 Pomeroy on Equity Jurisprudence, § 1343. Star Co. v. Press Pub. Co. et al., 162 App. Div. 486, 147 N. Y. Supp. 579.

The rule has been frequently applied to actors, or stars in the theatrical profession, of special and attractive talents. In Metropolitan Ex. Co. v. Ward, 24 Abb. N. C. 393, 9 N. Y. Supp. 779, the court said:

"Between an actor of great histrionic ability and a professional baseball player, of peculiar fitness and skill to fill a particular position, no substantial distinction in applying the rule laid down in the cases cited can be made. Each is sought for his particular and peculiar fitness, each performs in public for compensation, and each possesses for the manager a means of attracting an audience. The refusal of either to perform according to contract must result in loss to the manager, which is increased in cases where such services are rendered to a rival."

It is shown by the affidavits read on the hearing of this motion that the defendant, Chase, is reputed to possess special, unique and extraordinary characteristics as a baseball player, and is generally regarded as the foremost first baseman in professional baseball. His reputation for these characteristics was recently advertised in a souvenir of "Hal Chase Day" by the Buffalo Federal League Club, for which he recently contracted to play.

The jurisdiction of equity, therefore, is clear in this case, and its power should be exercised by injunction enforcing the negative covenant of the defendant's contract, providing the contract does not lack mutuality and is not a part of an illegal scheme or combination.

[2] The first question, therefore, to be determined is whether the contract between the plaintiff and the defendant is a mutual contract which furnishes a consideration for the negative covenant sought to be enforced in this action. The Player's Contract, which was signed by the parties, provides:

"7. The club may, at any time after the beginning and prior to the completion of the period of this contract, *give the player ten days' written notice to end and determine all its liabilities and obligations hereunder*; in which event the liabilities and obligations undertaken by the club shall cease

and determine at the expiration of said ten days. The player, at the expiration of said ten days shall be freed and discharged from all obligations to render service to the club."

It thus appears that the defendant could rely upon only 10 days of compensated service with the plaintiff under the contract.

For the purpose of determining to what extent, and for how long a period, the defendant is bound by this contract, as affected by the National Agreement and the Rules of the National Commission, it will be necessary for us to consider analytically what the whole transaction represented by the three instruments, namely, the Player's Contract, the National Agreement, and the Rules and Regulations of the National Commission, undertakes to accomplish, and, in practice, actually does accomplish, as shown by the papers read on this motion.

Section 1, article II of the National Agreement provides as follows:

### "Article II.

"Section 1. Each party to this agreement retains the right to conduct its affairs and govern its players according to its constitution and by-laws, *not in conflict with this agreement.*"

Section 1, article VIII, is in part as follows:

### "Article VIII.

"Section 1. All contracts between clubs and players in the Major Leagues shall be *in form prescribed by the commission.* All contracts between clubs and players in the National Association shall be in form prescribed by that association, provided, however, that no *nonreserve* contract shall be entered into by any club operating under the National Agreement, until permission to do so has been first obtained from the commission when such contract concerns a Major League player, or from the National Board of Arbitration of the National Association when such contract concerns a player of that organization."

Section 1, article IV, is in part as follows:

### "Article IV.

"Section 1. A commission of three members, to be known as the National Commission, is hereby created *with power to construe and carry out the terms and provisions of this agreement,* excepting when it pertains solely to the internal affairs of a party to this agreement. One member shall be the president of the National League and one the president of the American League. These two members shall ＊ ＊ ＊ elect by a majority vote a suitable person as the third member."

It thus clearly appears that the Player's Contract, together with the National Agreement and the Rules of the National Commission adopted pursuant to that agreement, must in law be considered as evidencing the general agreement or plan regulating the employment and conduct of the defendant as a National Agreement player. The Player's Contract further provides as follows:

"1. The club agrees to pay the player for the season of 1914 beginning on or about the 14th day of April, 1914, and ending on or about the 15th day of October, 1914, a salary at the rate of $4,500 for such season; and an additional sum at the rate of $1,500 for such season, said additional sum being *the consideration of the option herein reserved to the club* in clause 10 hereto; said additional sum to be paid whether said option is exercised or not, making

the total compensation to the player for the season herein contracted for $6,000."

"8. The player agrees to perform for no other party during the period of this contract (unless with the written consent of the club).  *   *   *

"9. The player will not, either during the playing season or before the commencement or after the close thereof, participate in an exhibition baseball game unless the written consent of the club has first been given to him.

"10. The player will, at the option of the club, *enter into a contract for the succeeding season upon all the terms and conditions of this contract*, save as to clauses 1 and 10, and the salary to be paid the player in the event of such renewal shall be the same as the total compensation provided for the player in clause 1 hereto, unless it be increased or decreased by mutual agreement."

## Section 3, article VI, of the National Agreement provides:

"The right and *title of a major league club to its players shall be absolute* and can be terminated only by release, neglect to comply with requirements under this agreement for reservations, or failure to fulfill its contractual obligations. *When a major league club serves notice of release on a player*, not secured within that or the preceding year from a minor league club or it or another major league club, *he shall be ineligible to contract with a club of another league*, if, during 10 days after service of such notice of release, a club of the league in which he is at the time playing shall demand his services."

## Paragraph II of the Player's Contract is as follows:

"II. The club shall not *transfer* the services of the player to any other club without furnishing the player in writing all of the conditions under which said transfer is made and showing what team has claim to his services and what that claim is."

## Section 9 of article VI of the National Agreement provides in this connection:

"A Major League Club *shall not be permitted to sell the release* of a selected player until he has been actually in its service *before the close of the season in which he was drafted* or during the following training or regular season, and then *only after waivers* to him have been obtained from all other Major League Clubs and notice has been received from the secretary of the National Board that no National Association club has claimed him *at the draft price*."

It appears that originally the defendant was a "selected" player; but whether he was a selected player at the time he entered the service of the plaintiff is immaterial. Had he come from the vacant lots of the cities, or the fields of the country, or from the college campus, and therefore been "a free agent," at the time he made his entry into "organized baseball," the result would have been the same. If a sale or trade is to be made by one major league club to another, section 3 of article VI governs, and "The right and title of a major league club to its players shall be absolute."

If a sale or trade is to be made by a major league club to a minor league club, section 9 of article VI governs, and the sale or trade is not absolute until waivers have been obtained from the other major league clubs. Thus a player in the highest league, without the exercise of any individual choice, may be required to take service with a club of a lower league where smaller salaries are paid, and where *both the aggregate of the salary list and the salary of each individual player* is

subject to strict limitation under the terms of the National Agreement. No opportunity is afforded the player to solicit employment upon his own account. No right is afforded to enable him to resist an unjust limitation upon his power to earn. No consideration is afforded either himself or his family with respect to choosing a home. In short, he is placed where he must, at all times while playing in "organized baseball," consider that his home is only the place in which his services are for the time being controlled.

The baseball player, even though about to be discharged, is still a thing of value to the club owner. The termination of the obligations by the club owner pursuant to the 10-day provision, is not accomplished by him without securing some return. If the player goes to another major league club, it is either in exchange for some other more desired player or players, or for the waiver price; and the same is true if the discharged player is sent to a league of lower grade.

It seems that the promotion of the ball player is also hedged about with such limitations as to make the property in him absolute whether he will accept terms or not, and to make those terms when arrived at only liberal enough to prevent the player from seeking other means of earning his livelihood.

Section 6 of article VI is in part as follows:

"Section 6. *The right of a Minor League Club to its players under this agreement shall be absolute* except that from September 15th to September 20th of each year each Major League Club shall have the privilege of selecting players from the National Association Clubs for the following season upon payment of the following sums: $2,500 for players selected from class AA. $1,500 for players selected from class A. $1,200 for players selected from class B. $750 for players selected from class C. $500 for players selected from class D."

This section also provides for the selection or drafting of players by the different minor leagues in the order of their baseball classification. It provides that if there be conflicting drafts, the conflict is to be determined by lot. The player is not given the right of choice. If such an opportunity were given him he could perhaps obtain a consideration for the exercise of his choice either in the form of a cash bonus or a larger salary.

"Organized baseball" as conducted under the terms of the National Agreement further seeks to enforce and perpetuate its title to and control of its players as follows:

Section 1, article VI, of the National Agreement provides:

"Section 1. *All parties to this agreement pledge themselves to recognize the right of reservation and respect contracts between players and clubs under its protection.* No club operating under this agreement shall at any time *negotiate for the purchase or lease of the property of another club* without first securing the consent of such club."

Section 2 of article VI is as follows:

"Section 2. *Any club or league which harbors a player who refuses to observe his contract with a club member of any party to this agreement, or to abide by its reservation, shall be considered an outlaw organization, and its claim to contractual and territorial rights ignored.*"

Thus the baseball player is made a chattel; the title of the club to the player, if he be a player of a major league, is made absolute; if he be a player of a minor league, its title is absolute, except in so far as the draft provisions are concerned. Section 6, article VI.

Section 2 of article VI recognizes the property of the club in the player as existing under two conditions: First, under a contract; and, second, under reserve without a contract.

Section 1, article VII, provides the manner in which the reservation is to be made, and the effect thereof, and is as follows:

### "Article VII.

"Section 1. On or before the 1st day of October in each year, the secretary of each party to this agreement shall transmit to the secretary of the commission a list of all players under contract to each of its club members on that date or at the close of the championship the following season, *together with those secured for future service by purchase or draft, or while free agents, and those under suspension or insubordination or other cause, as well as those ineligible for refusal to respect reservation by, or contract with such club, for that or a preceding season.* The secretary of the commission shall thereupon promulgate all of such lists which conform to the limitations of the reservation privileges of clubs according to rank and classification as shown in section 3 of article VI, and *no player thus promulgated as reserved shall be eligible to contract* or play with any National Agreement club other than that on whose list his name appears as a reserved player until he is regularly released by the reserving club."

If the club has not been able to obtain the player's consent to the salary which has been offered him for the ensuing season, section 2, article VII, accomplishes his release as follows:

"Section 2. No club shall be permitted to reserve a player while in arrears of salary to him; and the *failure of a club to tender a reserved player a contract for the ensuing season by February 1st*, shall be construed as a revocation of its reservation and shall operate as his unconditional release."

If the player has ideas of his own, which fail to accord with those of the club, the National Agreement enables the club to enforce its own terms, leaving the player the option to enter some other trade, calling, or profession, if he is not satisfied.

The scheme of the National Agreement to perpetuate control over a player by means of contracts apparently legal is interesting and pertinent. Each term contract, as appears by section 1 of article VIII, must contain a reserve clause or option to renew, and this article of the National Agreement is further enforced by section A, rule 17, of the National Commission, which is as follows:

"A nonreserve clause in the contract of a major league player without the approval of the commission or of a minor league player without the approval of the National Board shall not be valid."

So that each new contract of the player must contain a reserve clause, and so by a series of contracts, "organized baseball" is able to perpetuate its control over the services of the player. But if, upon the other hand, a contract is at any time unobtainable, or even in fact not in good faith sought to be obtained, as the club owner might offer an immoderately low salary, then the provisions for reservation and the

respecting thereof, apply and safeguard the "absolute title" of the club.

But why should a player enter into a contract when his liberty of conduct and of contract is thus curtailed? The answer is that he has no recourse. He must either take the contract under the provisions of the National Agreement, whose organization controls practically all of the good ball players of the country, or resort to some other occupation. Section 2 of article VIII is as follows:

"Article VIII.

"Section 2. Any agreement between club and player for service, evidenced by written acceptance, whether by letter or telegram, or receipt from player for money advanced to him to bind such agreement, shall be construed to be a contract and held to be binding, provided the player declines to enter into a formal contract; *but his refusal to sign such formal contract shall render him ineligible to play with the contracting club for more than a period of ten days, or to enter the service of a club of any party to this agreement unless released.*"

And this provision of the National Agreement is further enforced by rule 23 of the National Commission, which is as follows:

"A fine of $25 shall be imposed on any National Agreement Club that permits a player to play on its team for a longer period than that prescribed in section 2, article VIII, of the agreement, without a formal contract, *and the right to reserve such player will not be recognized.*"

Rule 19 of the National Commission provides for blacklisting players as follows:

"A National Agreement player, adjudged to have violated his contract, *shall be declared and promulgated to be ineligible* to play with or against any club in organized baseball until reinstated on his application by the commission, if he be a Major League player, or by the National Board if he be a Minor League player. If, after full investigation, the tribunal, having jurisdiction finds that such violation of contract was premeditated and without palliating circumstances, the application of the offender for reinstatement will not be considered until the player has given satisfactory assurance that he will not repeat the offense, and will not be granted without the imposition of an adequate penalty."

And also by rule 20:

"A player who fails to report to or deserts the club having title to his services *shall be declared and promulgated to be disqualified* as a National Agreement player until restored to good standing on his application by the commission, if a Major League player, or by the National Board, if a Minor League player. In all cases of failure to report or desertion the offender may be reinstated with or without a fine, in the discretion of the tribunal having jurisdiction, provided, however, that if the player shall have joined an outlaw team his application for the removal of his disability shall not be acted on within three years after the commission of the offense."

There are other provisions of the National Agreement indicating its purpose. Section 1, article VIII provides that a drafted Major League player's salary shall not be over 25 per cent. in excess of that paid him by the Minor League Club from which he was secured, the amount to be established by affidavits from him and the president of the club from which he was obtained. All salaries of Minor League players are limited, not alone the individual salary of the player, but

.the aggregate salaries of all the players. Section 5, article VI. The territory of each club is made inviolate. Section 1, article VI.

This somewhat extended analysis shows to what extent the contract between the plaintiff and the defendant presents reciprocal and mutual, enforceable obligations. The plaintiff can terminate the contract at any time on 10 days' notice. The defendant is bound to many obligations under the remarkable provisions of the National Agreement. The Player's Contract executed in accordance with its terms, binds him, not only for the playing season of six months from April 14th to October 14th, but also for another season, if the plaintiff chooses to exercise its option, and if it insists upon the requirement of an option clause in each succeeding contract, the defendant can be held for a term of years. His only alternative is to abandon his vocation. Can it fairly be claimed that there is mutuality in such a contract? The absolute lack of mutuality, both of obligation and of remedy, in this contract, would prevent a court of equity from making it the basis of equitable relief by injunction or otherwise. The negative covenant, under such circumstances, is without a consideration to support it, and is unenforceable by injunction.

The authorities in the state of New York, with possibly one exception (Hoyt v. Fuller, 19 N. Y. Supp. 962, decided at the Special Term of the Superior Court of the city of New York in 1892), uniformly sustain the rule that an injunction to restrain a defendant from violating the negative stipulation in his contract not to render his services for another, where the facts in the case otherwise bring him within the rule as to services of a special, unique or extraordinary character, will not lie, where the contract provides that the person seeking to secure the injunction may terminate or revoke the contract on notice. The reasons, among others, given for this rule are as follows: First, that no court can with reason be called upon to do a vain and useless thing, for, if the court issues the injunction the person in whose favor the injunction may issue might render nugatory the action of the court by terminating the contract; and, second, that the contract, being unilateral, lacks mutuality in that, the employer having the right to terminate the contract, the employé is remediless when such right is exercised. He can neither secure specific performance of the contract in an action against the employer in a court of equity, nor damages in an action at law; hence he is remediless, and therefore, while a court of equity will enjoin the breach of a negative covenant in contracts which contain no clause permitting a termination of the contract upon notice, they will not intervene by injunction where contracts contain such a clause. Metropolitan Ex. Co. v. Ward, 24 Abb. N. C. 393, 9 N. Y. Supp. 779; Lawrence v. Dixey, 119 App. Div. 295, 104 N. Y. Supp. 516; Dockstader v. Reed, 121 App. Div. 846, 106 N. Y. Supp. 795; Levin v. Dietz, 194 N. Y. 376, 381, 87 N. E. 454, 20 L. R. A. (N. S.) 251; Star Co. v. Press Pub. Co. et al., supra; Arena Athletic Club v. McPartland, 41 App. Div. 352, 58 N. Y. Supp. 477; Wadick v. Mace, 191 N. Y. 5, 83 N. E. 571; Ide v. Brown, 178 N. Y. 26, 70 N. E. 101; Palmer v. Gould, 144 N. Y. 671, 39 N. E. 378.

The case of Duff v. Russell, 60 N. Y. Super. Ct. 80, 14 N. Y. Supp.

134, cited by the plaintiff, is not an authority upon the question involved in the present case.

We are not now dealing with a case like McCall v. Wright, 198 N. Y. 143, 91 N. E. 516, 31 L. R. A. (N. S.) 249, also cited by the plaintiff, in which an employé, after severance of his relations with his employer, endeavors to make merchandise of the latter's secrets which he has learned in the course of his employment, nor with a case in which a person who has sold his business and the good will thereof and received the consideration therefor has agreed, as a part of the consideration which he has given for the price paid him, not to compete with his vendee.    Such cases rest upon quite different principles from those which govern the present case.

The New York rule followed in this case has been uniformly held in other jurisdictions.    Rutland Marble Co. v. Ripley, 10 Wall. 339, 19 L. Ed. 955; Ulrey v. Keith, 237 Ill. 284, 86 N. E. 696, and cases there cited; Rust v. Conrad, 47 Mich. 449, 11 N. W. 265, 41 Am. Rep. 720; Watford Oil & Gas Co. v. Shipman, 233 Ill. 9, 84 N. E. 53, 122 Am. St. Rep. 144; Lee v. Chicago League Baseball Club, 169 Ill. App. 525; Sturgis v. Galindo, 59 Cal. 28, 43 Am. Rep. 239; Marion Co. v. Dykstra, 165 Ill. App. 390; Brooklyn Baseball Club v. McGuire (C. C.) 116 Fed. 782; Weegham v. Killefer, 215 Fed. 168, U. S. District Court W. D. Mich. S. D., opinion by Sessions, J., decided April, 1914; Duff v. Hopkins (D. C.) 33 Fed. 599; Shields v. Trammell, 19 Ark. 51; Taussig v. Corbin, 73 C. C. A. 656, 142 Fed. 660; Giles v. Dunbar, 181 Mass. 22, 62 N. E. 985.

The case of Philadelphia v. La Joie, 202 Pa. 210, 51 Atl. 973, 58 L. R. A. 227, 90 Am. St. Rep. 627, cited with McCaull v. Braham, by the plaintiff in favor of a contrary rule, was decided prior to the case of Brooklyn Baseball Club v. McGuire (C. C.) 116 Fed. 782, and other cases constituting the weight of authority, which sustain the rule now followed by this court.    In McCaull v. Braham (C. C.) 16 Fed. 37, the question of the lack of mutuality of the contract of personal service was not involved.    Since the argument of the present case the Appellate Court of the state of Illinois on June 16, 1914, reversed the decision rendered by Judge Foell June 3, 1914, in the Superior Court in Cook County of that state in Cincinnati Ex. Co. v. Johnson.    Mr. Justice Baker, delivering the opinion of the court, says:

"In the opinion of the majority of the court, the provision in the contract by which the club, by giving notice, could end and determine all the liabilities undertaken by the club under the contract is a fatal objection to the right of the club to enforce by injunction the performance by Johnson of his negative covenant not to play or perform for any other than the club."

In Cincinnati Ex. Co. v. Marsans, 216 Fed. 269, U. S. Dist. Court, Dist. of Mo., an examination of the short bench opinion filed July 1, 1914, by Judge Sanborn, for whose learning this court has great respect, discloses no discussion of the question of the mutuality of the contract, and no citation of authorities in support of the court's conclusions.

[3] The question has also been raised on this motion as to whether the National Agreement (so-called) and the rules and regulations

adopted pursuant thereto, violate the Sherman Act. The novel argument is presented with much earnestness by the learned counsel for the defendant that the combination formed by the operation of the National Agreement and the rules and regulations of the National Commission thereunder, with which the defendant is connected through his contract with the plaintiff, is in direct violation of "An act to protect trade and commerce against unlawful restraints and monopolies," in force July 2, 1890, and popularly known as the "Sherman Anti-Trust Law." It is apparent from the analysis already set forth of the agreement and rules forming the combination of the baseball business, referred to as "organized baseball," that a monopoly of baseball as a business has been ingeniously devised and created in so far as a monopoly can be created among free men; but I cannot agree to the proposition that the business of baseball for profit is interstate trade or commerce, and therefore subject to the provisions of the Sherman Act. An examination of the cases cited by the defendant confirms rather than changes my conclusion.

Commerce is defined by the Century Dictionary as an—

"interchange of goods; merchandise or property of any kind; trade; traffic; used more especially of trade on a large scale carried on by transportation of merchandise between different countries, or between different parts of the same country, distinguished as foreign commerce and internal commerce."

The defendant urges that under the National Agreement baseball players are bought and sold and dealt in among the several states, and are thus reduced and commercialized into commodities. A commodity is defined as:

"That which is useful; anything that is useful or serviceable; particularly an article of merchandise; anything movable that is a subject of trade or of acquisition."

We are not dealing with the bodies of the players as commodities or articles of merchandise, but with their services as retained or transferred by contract. The foundation of the National Agreement is the game of baseball conducted as a profitable business, and if this game were a commodity or an article of merchandise and transported from state to state, then the argument of the defendant's counsel might be applicable. Judge Grosscup in U. S. v. Swift & Co. (C. C.) 122 Fed. 531, said:

"Commerce, briefly stated, is the sale or exchange of commodities. But that which the law looks upon as the body of commerce is not restricted to specific act of sale or exchange. It included the intercourse—all the initiatory and intervening acts, instrumentalities, and dealings—that directly bring about the sale or exchange."

In the Knight Case, 156 U. S. 13, 15 Sup. Ct. 254, 39 L. Ed. 325, it is said:

"Contracts to buy, sell, or exchange goods to be transported among the several states, the transportation and its instrumentalities, and articles bought, sold, or exchanged for the purposes of such transit among the states, or put in the way of transit, may be regulated, but this is because they form part of interstate trade or commerce."

Baseball is an amusement, a sport, a game that comes clearly within the civil and criminal law of the state, and it is not a commodity or an article of merchandise subject to the regulation of Congress on the theory that it is interstate commerce.

[4] Another question to be determined upon this motion is whether so-called "organized baseball," operating under the provisions of the National Agreement and the Rules and Contracts subsidiary thereto, is an illegal combination or monopoly in contravention of the common law. The affidavits read on the hearing of this motion show that a combination of 40 leagues, major and minor, has been formed under the terms of the National Agreement, controlling for profit the services of 10,000 players of professional baseball, practically all of the good or skillful players in the country. The analysis of the National Agreement and the Rules of the Commission, controlling the services of these skilled laborers, and providing for their purchase, sale, exchange, draft, reduction, discharge, and blacklisting, would seem to establish a species of quasi peonage unlawfully controlling and interfering with the personal freedom of the men employed. It appears that there is only one league of any importance operating independently of the National Commission, and that is the newly organized Federal League which comprises eight clubs in eight cities. "Organized baseball" is now as complete a monopoly of the baseball business for profit as any monopoly can be made. It is in contravention of the common law, in that it invades the right to labor as a property right, in that it invades the right to contract as a property right, and in that it is a combination to restrain and control the exercise of a profession or calling.

"The right to labor is a property right, entitled to the same protection as capital, and it is said that labor is the poor man's capital." 3 Elliott on Contracts, 13, page 863, § 2698. "The right of a workman to freely use his hands and to use them for just whom he pleases is his property, and so in no less degree is a man's business, in which he has invested his capital. The right of each, employer and employé, is an absolute one, inherent and indefeasible, of which neither can be deprived, not even by the Legislature itself. The protection of it, though as old as the common law, has been reguaranteed in our Bill of Rights. 'All men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing, and protecting property and reputation, and of pursuing their own happiness.' Const. art. 1, § 1. 'The principle upon which the cases, English and American, proceed is that every man has the right to employ his talents, industry, and capital as he pleases, free from the dictation of others; and if two or more persons combine to coerce his choice in this behalf, it is a criminal conspiracy. The labor and skill of the workman, be it of high or low degree, the plant of the manufacturer, the equipment of the farmer, the investments of commerce are all, in equal sense, property.' " Purvis v. United Brotherhood of Carpenters and Joiners, 214 Pa. 348, 63 Atl. 585, 12 L. R. A. (N. S.) 642, 112 Am. St. Rep. 757, 6 Ann. Cas. 275 (1906); State v. Cadigan, 73 Vt. 245, 251, 50 Atl. 1079, 57 L. R. A. 666, 87 Am. St. Rep. 714; Erdman v. Mitchell, 207 Pa. 79, 56 Atl. 327, 63 L. R. A. 534, 99 Am. St. Rep. 783.

In Clark on Employment of Labor (1911) the author on page 5 says:

"Every man has the right to earn his living, or to pursue his trade or business, without undue interference, a right of absolute freedom to employ or be employed, to make contracts with reference to service, whether as employer or employé, or to refrain from making them, for any reason or no reason, and

such a right is both a liberty and a property right, within the guaranty of the federal Constitution" (citing Jersey City Printing Co. v. Cassidy, 63 N. J. Eq. 759, 53 Atl. 230; Adair v. United States, 208 U. S. 161;[1] N. Y. C. & St. L. R. Co. v. Schaffer, 65 Ohio St. 414, 62 N. E. 1036, 62 L. R. A. 931, 87 Am. St. Rep. 628; State v. Missouri Tie & Timber Co., 181 Mo. 536, 80 S. W. 933, 65 L. R. A. 588, 103 Am. St. Rep. 614, 2 Ann. Cas. 119; Jones v. Leslie, 61 Wash. 107, 112 Pac. 81, 48 L. R. A. (N. S.) 893, Ann. Cas. 1912B, 1158).

Again the same author, on pages 315, 316, says:

"The right to choose one's calling is an essential part of the liberty which it is the object of the government to protect; and the calling when chosen is one's property and right. The occupation by means of which a man earns a livelihood and supports those dependent upon him is property within the meaning of the law, and entitled to protection as such" (citing Slaughter House Cases, 16 Wall. 83 [U. S.] 36, 21 L. Ed. 394; Gray v. Building Trades Council, 91 Minn. 171, 97 N. W. 663, 63 L. R. A. 753, 103 Am. St. Rep. 477, 1 Ann. Cas. 172; Beck v. Railway Teamsters' Prot. Union, 118 Mich. 497, 77 N. W. 13, 42 L. R. A. 407, 74 Am. St. Rep. 421).

In Black on Constitutional Law (3d Ed.) page 574, § 217, the author says:

"Everything which the law recognizes as property is within the protection of the Constitution. Thus the liberty of making contracts is property or at least a property right, and labor is property."

"The relation of master and servant is purely voluntary, resting upon the contract of the parties, and as a general proposition it must ever remain voluntary. The relation ordinarily cannot rest upon compulsion. Every man has a natural right to hire his services to any one he pleases, or refrain from such hiring; and so, likewise, it is the right of every one to determine whose services he will hire. 'It is a part of every man's civil rights,' says Mr. Cooley, 'that he be left at liberty to refuse business relations with any person whomsoever, whether the refusal rest upon reason, or as the result of whim, caprice, prejudice, or malice. With his reasons neither the public nor third person have any legal concern.'" 2 Tiedeman on State and Federal Control of Persons and Property (1900) pp. 938, 939, § 204.

See, also, Gillespie v. People, 188 Ill. 176, 58 N. E. 1007, 52 L. R. A. 283, 80 Am. St. Rep. 176 (1900); State v. Julow, 129 Mo. 163, 31 S. W. 781, 29 L. R. A. 257, 50 Am. St. Rep. 443.

Under the heading of "Combinations of capital for (a) unlawful purposes, and for (b) oppressive purposes," Eddy on Combinations (section 559), says:

"The right to employ his labor and capital as he pleases for any lawful purpose is an essential part of the personal liberty guaranteed each man by free institutions. A combination of two or more persons to interfere with this freedom, and by oppression, coercion, or intimidation to restrict this right, is a conspiracy. It is a criminal conspiracy if any of the means used or objects in view are of a criminal character; if no criminal element enters into the means or the objects, then it is a civil conspiracy."

So, also, Gleason v. Thaw, 185 Fed. 345, 107 C. C. A. 463, 34 L. R. A. (N. S.) 894 (C. C. A. 3d Cir. 1911); Butchers' Union Co. v. Crescent City Co., 111 U. S. 746, 4 Sup. Ct. 652, 28 L. Ed. 585; Hitchman Coal & Coke Co. v. Mitchell et al. (D. C.) 202 Fed. 512 at 528, 546, 547, 551; Goldfield Consol. Mines Co. v. Goldfield Miners' Union No. 220, et al. (C. C.) 159 Fed. 500; State v. Stewart, 59 Vt. 273, 9 Atl. 559, 59 Am. Rep. 710 (1887).

[1] 28 Sup. Ct. 277, 52 L. Ed. 436, 16 Ann. Cas. 764.

In Metropolitan Exhibition Co. v. Ewing, 42 Fed. 198, 7 L. R. A. 381, 24 Abb. N. C. 419, the National Agreement here under consideration was in the earlier years of its operation considered and condemned. The court (Wallace, J.) said:

"Inasmuch as the parties to the National Agreement comprise all, or substantially all, of the clubs in the country which employ professional players, this National Agreement, by indirection, but practically, affects every professional player, and subordinates his privilege of engaging as he chooses to the option of the club by which he is under reservation. * * * As a coercive condition which places the player practically, or at least measurably, in a situation where he must contract with the club that has reserved him, or face the probabilities of losing any engagement for the ensuing season, it is operative and valuable to the club. * * * The players were not in a position to act independently; and, if they had refused to consent to the terms proposed by the clubs, they would have done so at the peril of losing any engagement."

If a baseball player like the defendant, who has made baseball playing his profession and means of earning a livelihood, desires to be employed at the work for which he is qualified and is entitled to earn his best compensation, he must submit to dominion over his personal freedom and the control of his services by sale, transfer, or exchange, without his consent, or abandon his vocation and seek employment at some other kind of labor. While the services of these baseball players are ostensibly secured by voluntary contracts a study of the system as hereinabove set forth, and as practiced under the plan of the National Agreement, reveals the involuntary character of the servitude which is imposed upon players by the strength of the combination controlling the labor of practically all of the players in the country. This is so great as to make it necessary for the player either to take the contract prescribed by the commission or abandon baseball as a profession and seek some other mode of earning a livelihood. There is no difference in principle between the system of servitude built up by the operation of this National Agreement, which as has been shown, provides for the purchase, sale, barter, and exchange of the services of baseball players—skilled laborers—without their consent, and the system of peonage brought into the United States from Mexico and thereafter existing for a time within the territory of New Mexico. The quasi peonage of baseball players under the operations of this plan and agreement is contrary to the spirit of American institutions, and is contrary to the spirit of the Constitution of the United States. It is time to heed the warning of that great jurist, the former Chief Judge of the Court of Appeals, Judge Cullen, who thought it advisable to take for the subject of his annual address at the last meeting of the New York State Bar association "The Decline of Personal Liberty in America," as evidenced by recent legislation and judicial decisions. The sanction by the courts of the system here outlined would indeed be further evidence of "The Decline of Personal Liberty."

The system created by "organized baseball" in recent years presents the question of the establishment of a scheme by which the personal freedom, the right to contract for their labor wherever they will, of 10,000 skilled laborers, is placed under the dominion of a benevolent despotism through the operation of the monopoly established by the

National Agreement. This case does not present the simple question of a laborer who has entered into a fair contract for his personal services.

While the question of the dissolution of this combination on the ground of its illegality is not before this court for decision, it has nevertheless been thought necessary for the purpose of ascertaining whether or not this plaintiff comes into a court of equity with clean hands to inquire into the organization and operations of the combination to which the plaintiff is a party. A court of equity, insisting that "he who comes into equity must come with clean hands," will not lend its aid to promote an unconscionable transaction of the character which the plaintiff is endeavoring to maintain and strengthen by its application for this injunction. The court will not assist in enforcing an agreement which is a part of a general plan having for its object the maintenance of a monopoly, interference with the personal liberty of a citizen, and the control of his free right to labor wherever and for whom he pleases, and will not extend its aid to further the purposes and practices of an unlawful combination, by restraining the defendant from working for any one but the plaintiff. The motion to vacate the preliminary injunction, pendente lite, is therefore granted, with $10 costs to the defendant.