CONNECTICUT PROFESSIONAL
SPORTS CORPORATION,
Plaintiff,

v.

Arthur HEYMAN, and Mark Bimstein,
and Arthur Brown, Individually, and
Mark Bimstein and Arthur Brown, Part-
nership doing business as the New Jer-
sey Americans of the American Basket-
ball Association, Defendants.

No. 67 Civ. 4165.

United States District Court
S. D. New York.

Dec. 5, 1967.

Yellin & Basine, Hartford, Conn., for plaintiff; Mark C. Yellin and Coleman B. Levy, Hartford, Conn., of counsel.

Leon Rock, New York City, for defendant Arthur Heyman.

MANSFIELD, District Judge.

In this diversity action, plaintiff, a Connecticut corporation, has moved pursuant to Rule 65, F.R.Civ.P., for an injunction *pendente lite* to prevent defendant Arthur Heyman, a New York citizen, from playing professional basketball with the New Jersey Americans or with any professional basketball team other than the Hartford Capitols of the Eastern Professional Basketball League.

Heyman, an All-American while at Duke University, was selected as one of the top 50 college basketball players of the century. Following his inability to succeed with two National Basketball Association teams, plaintiff purchased Heyman's contract from the Wilmington Blue Bombers of the Eastern League for $1500. On October 20, 1966, he entered into a contract with plaintiff (hereinafter "the Club") under the terms of which he agreed to furnish his services

as a basketball player exclusively to the Club for the one-year period ending August 31, 1967, engaging in "as many games as requested by the club" and giving "his best and most skillful performance at all times", for which he was to be paid $125, plus $50 expenses, for each regular season and play-off game "actually played". The agreement acknowledged that Heyman possessed "special knowledge, skill and ability to play professional basketball, and [that] the services of the player are of unique character and require a high degree of efficiency which must be maintained at all times in order to meet the requirements of competition within the league, as well as to insure fulfillment of the demands of the public". The Club was given the option of renewing the contract with all of the terms, provisions and conditions for a one-year period, provided that the new salary should be agreed upon by the parties, or, in default of agreement, should be fixed by the Club.[1]

In order to exercise its option, the Club was required to serve Heyman with written notice prior to August 31, 1967.

At any time, the Club could give written notice terminating all of its liabilities and obligations under the contract.[2] Thereafter, Heyman would be free of his obligations under the contract and able "to negotiate a new contract for himself with any other club in the league."

Heyman also agreed that, if he played professional basketball for another club or organization during the option period, without the Hartford Capitols' written consent, the Club would be entitled to commence proceedings to obtain injunctive relief.[3] Verbal contracts between the parties were not to bind either of them. The Club's rules and regulations, which were incorporated by reference, provided for "liquidated damages" in the amount of $100 per game for each regularly scheduled game in which the player failed to appear.[4]

1. Paragraph 2 of the agreement provided: "That for the consideration above mentioned, the club shall have the option or right to renew this contract with all its terms, provisions and conditions for another period of one year, provided, however, that the rate of salary shall be such as the parties may agree upon, or in default of agreement, such as the club shall fix; and the player hereby agrees to perform similar services and be subject to all the obligations, duties and liabilities prescribed in this contract for the period or periods of such renewal, including the rate of salary fixed by the club in the event the salary rate cannot be fixed by agreement of the parties, provided only that written notice of the exercise of such option of renewal be served upon the player prior to August 31, 1967."

2. Paragraph 1 provided: "That the club may at any time after the beginning and prior to the completion of the period of this contract, give written notice of its option and intention to end and terminate all of its liabilities and obligations under this contract, in which event all liabilities and obligations of the club shall cease and terminate immediately. The playear [sic] shall thereupon be freed and discharged from his obligations hereunder, shall have no claim for salary or other compensation thereafter, and shall be free to negotiate a new contract for himself with any other club in the league."

3. Paragraph 6(D) provided: "That if during the term of his employment without the written consent of the club, he shall leave the service or perform services or agree to perform in the future services for any other club or organization, * * * if the club elects to, it may institute and prosecute proceedings in any United States courts of competent jurisdiction * * * in * * * equity * * * to enforce the specific performances thereof by the player, or to enjoin the player from performing services for any other person or organization during the period of time contracted for by the within parties, including specifically, any renewals of the original contract made pursuant to the option to renew as provided herein."

4. Paragraph 8 of the Rules and Regulations of the Hartford Professional Basketball Team provided that: "Should [the player] fail to appear or fail to fulfill any of his obligations, the parties agree that Player may be subject to suit for damages in any court of competent jurisdiction or that, at the option of the Club, he will pay to the Club, as liqui-

During the 1966–67 season, Heyman played in every one of the 28 games that the Hartford Capitols played. His sharp-shooting ability (an average of 33 points per game) made him the League's highest scorer, the star of the Capitols and Hartford's darling; he was awarded a trophy as the most popular player on the team. In March 1967, the fickle hero learned that the American Basketball League was being formed, and a short time later, Heyman signed a contract to play for the New Jersey Americans during the 1967–68 season at a salary of $15,000 (Heyman's Affidavit, p. 4). Upon becoming aware of these events, on May 23, 1967, the Club, intending to give the written notice required to exercise its option, mailed Heyman a document identical to the former contract (Plf's Ex. C), except that the salary provision was increased to $150 per game and the renewal option was not inserted. Heyman did not sign the document. On the same date, the Club wrote to Messrs. Arthur Brown and Mark Bimstein, partners doing business as the New Jersey Americans, informing them of its renewal rights under the original contract with Heyman, and indicating a willingness to settle the matter on an amicable basis (Def's Ex. A). However, whatever negotiations took place fell through, and plaintiff on October 26, 1967 commenced its suit by way of show cause order seeking preliminary injunctive relief.

Plaintiff's motion is denied for the reason that while it appears that plaintiff may be entitled to damages occasioned by defendants' breach of contract, this Court believes that it ought not exercise the powers of the Chancellor because the terms and provisions of this contract are too harsh and one-sided to permit equitable enforcement.

Injunctive relief that has the effect of precluding an athlete from appearing before the public is an extraordinary remedy, to be granted only where the equities favor the plaintiff, and the injury that will be suffered by the plaintiff upon denial of relief is irreparable and outweighs the harm to the defendant that will be caused by the granting of relief. Machen v. Johansson, 174 F.Supp. 522, 527 (S.D.N.Y.1959) (Kaufman, J.). Although other courts have granted negative injunctive relief in similar circumstances, e. g., Winnipeg Rugby Football Club v. Freeman, 140 F.Supp. 365 (N.D.Ohio 1955); Lemat Corp. v. Barry, No. 580287 (Cal.Super.Ct. 1967); Philadelphia Ball Club v. Lajoie, 202 Pa. 210, 51 A. 973, 58 L.R.A. 227 (1902), the law in this District and in New York is that each case is *sui generis* and decisions hinge upon a careful analysis of the contractual terms.[5] Bethlehem

---

dated damages, and not as a penalty, the sum of $100.00 per game for each regularly scheduled Eastern League game in which is [sic] fails to appear, except if said failure to appear is caused by acts of God or by physical incapacity caused by injury, but only if Club's physician agrees that said physical incapacity in fact prevents participation."

5. In view of the fact that the New York cases and the decisions of this Court adopt the same approach, namely, that the granting of negative injunctive relief pursuant to a contract for an athlete's personal services is discretionary with the court, and rests upon an evaluation of the contract's terms to see whether they are not unduly harsh or one-sided, Long Island American Ass'n Football Club v. Manrodt, 23 N.Y.S.2d 858, 860 (Sup.Ct. Queens Co. 1940); American League Baseball Club v. Chase, 86 Misc. 441, 149 N.Y.S. 6 (Sup.Ct. Erie Co. 1914), this Court is not called upon to decide whether a federal court should deny preliminary injunctive relief in a diversity case where a state court would grant such relief. See Columbia Nastri & Carta Carbone v. Columbia Ribbon & Carbon Mfg. Co., 367 F.2d 308, 313 n. 5 (2d Cir. 1966) (Lumbard, C. J.); cf. Holmberg v. Armbrecht, 327 U.S. 392, 398, 66 S.Ct. 582, 90 L.Ed. 743 (1946) (Rutledge, J., concurring).

Additionally, it is unnecessary to decide whether, under the New York "grouping of contacts" rule, New York would measure the propriety of preliminary injunctive relief in this case by its own or by Connecticut law, the question not having been raised by the parties, Columbia Nastri & Carta Carbone v. Columbia Ribbon & Carbon Mfg. Co., supra, 367 F. 2d at 311 n. 1, 313 n. 5, and there being no showing that applicable Connecticut

Engineering Export Co. v. Christie, 105 F.2d 933, 125 A.L.R. 1441 (2d Cir. 1939) (L. Hand, J.); American League Baseball Club v. Chase, 86 Misc. 441, 149 N.Y.S. 6 (Sup.Ct. Erie Co. 1914).

 The primary reason for denying relief is the fact that plaintiff seeks to enforce a contract that purports to bind defendant for a one-year period and at the same time permit plaintiff to terminate at will. While this Court does not adhere to a wooden mutuality rule, the existence of a provision entitling plaintiff to end the contract whenever it chooses is an important factor in determining whether injunctive relief is appropriate. Kenyon v. Weissberg, 240 F. 536, 538 (S.D.N.Y.1917). Furthermore, Heyman is entitled as a matter of right to engage only in those games where his services are "requested by the Club" (Par. 6(A)). Since he is compensable under the contract only for "each game actually played," it is questionable whether he would be entitled to compensation for games in which he did not "actually" play, or at least dress.[6] For instance, if he were injured (a distinct occupational hazard) or became ill, he would not be entitled to any compensation, although he would be obliged to play with the Club when he recovered. In addition, although the Hartford Capitols played 28 games during the 1966–67 season, and expect to play 32 games during the 1967–68 season, there is no provision in the contract requiring that a minimum number of games be played. If, for example, a 10-game season were scheduled, Heyman would be limited to an even more meager annual salary than he had been earning, cf. Chapin v. Powers, 73 N.Y.S. 2d 854 (Sup.Ct.N.Y.Co.1947) (Lumbard, J.) (injunctive relief denied where salary of $50 per performance called into serious question opera singer's unique

services), and he would be unable to earn additional income because the contract does not permit him to play basketball and advance himself in his trade during those periods when the Hartford Capitols are not playing basketball.

We recognize that plaintiff did not, during Heyman's one year with it, invoke any of the foregoing one-sided provisions to his harm, and that plaintiff contemplated another harmonious season in which, if all went well, the basketball player would continue as a star, possibly receiving as much as $6550 for the 1966–67 season and up to $8500 if the Capitols qualified for an eight-game playoff. Plaintiff also enabled defendant to supplement his income by finding for him a job as an insurance agent in Hartford. These considerations, however, are insufficient to justify giving plaintiff the right to equitable enforcement of a contract which could be used by it to prevent defendant from earning a living wage from his basketball court activities.

Thus, this Court is constrained, in the exercise of its discretion, to stay its hand and deny negative injunctive relief, Kenyon v. Weissberg, supra, thereby leaving plaintiff to pursue its remedy at law for damages. Although I am cognizant of the interest in giving fledgling organizations, such as the plaintiff in this case, sufficient protection to enable them to compete with their well-entrenched rivals, such as the National Basketball Association, enforcement by way of negative injunctive relief of one-sided bargains such as these would further this interest only at the expense of one who has even less economic power.

The foregoing will constitute the findings of fact and conclusions of law under Rule 52(a), F.R.C.P.

Motion denied.

So ordered.

---

law differs from that of New York. However, assuming this Court were called upon to resolve this question, Franke v. Wiltschek, 209 F.2d 493, 497 (2d Cir. 1953) (Clark, C. J.), suggests that New York law would govern.

6. The contract is ambiguous on this point since under the main agreement "payment shall be for each game actually played", while under Paragraph 7 of the Rules and Regulations payment is made "only to players who dress for game."