METROPOLITAN EXHIBITION CO. *v.* WARD.

*(Supreme Court, Special Term, New York County.  January 28, 1890.)*

1. INJUNCTION—BREACH OF CONTRACT—INADEQUATE DAMAGES.
   Where a person enters into a definite contract to render to another, and to no one else, personal services of such a nature that their loss to the employer and acquisition by another would cause injury not to be compensated for in damages, a breach of the contract in leaving the employer and contracting with a rival may be restrained by injunction.

2. SAME—PRELIMINARY INJUNCTION.
   Where a suit to restrain a threatened breach of contract is pending, and final judgment therein may be had before the breach can injure plaintiff, a preliminary injunction will not be granted.

3. CONTRACT—INTERPRETATION—CERTAINTY AND MUTUALITY.
   Defendant contracted to render to plaintiff services as a base-ball player for the season of 1889, and the contract provided that he might be reserved for the season of 1890, on a salary of not less than $3,000.  No fixed salary nor definite terms and conditions were provided for 1890.  The contract also provided that plaintiff might terminate the contract "at any time by giving defendant 10 days' notice."  *Held,* that the contract, so far as it reserved defendant's services for the season of 1890, was not sufficiently definite nor mutual to entitle plaintiff to a preliminary injunction pending suit to restrain defendant from making another contract for 1890.

Action by the Metropolitan Exhibition Company against John M. Ward. Plaintiff moves for a preliminary injunction.

*George F. Duysters,* (*Evarts, Choate & Beaman,* of counsel,) for plaintiff. *Anderson & Howland,* (*Henry E. Howland* and *George Wellwood Murray,* of counsel,) for defendant.

O'BRIEN, J.  This is a suit brought in equity to restrain the defendant from playing the game of base-ball or rendering services of any kind until October 31, 1890, for or in behalf of any person or corporation except the plaintiff.  It is sought by this motion to enjoin the defendant until the trial can be had.  The plaintiff bases its right to the relief sought upon an agreement between the New York Base-Ball Club and the defendant, dated April 23, 1889.  This agreement provided that the defendant was to engage in the exhibition of the game of base-ball for the said club for the period of seven months between April 1, 1889, and October 31, 1889.  It also contained a provision which will be hereafter more fully set forth and discussed, by which it gave to the plaintiff the right "to reserve" the defendant for the season of 1890.

One of the principal questions discussed upon the argument was as to the meaning of this word "reserve," as used in the contract.  Upon the part of the plaintiff it is claimed that the meaning of this word is clear and unambiguous, requiring no explanation, being used in its ordinary sense of "to hold; to keep for future use."  The defendant, on the other hand, claims that this word, which was not a new one to the parties, has a history, and with that history both parties to the contract were well acquainted; that it had always been used in a particular sense, and in order to ascertain that meaning reference must be had to the history of the word; that if resort is had to such history it will result in a construction to be given to the contract which shall determine that when the defendant accorded the right to reserve his services it was not thereby meant that he was absolutely pledged or bound to plaintiff, but that his services were reserved to the exclusion of any other member of the league of ball clubs.  In other words, the word "reserve," defendant contends, referred only to the right and practice of reservation previously exercised under the national agreement, and did not prohibit a player from contracting with or playing for any club outside the purview of the national agreement.  It is not necessary to go over the history of the word or mention the agreements subsequent to the one entered into at the

meeting of the National League of base-ball clubs in September, 1879, when this word "reserve" appears to have been first used in a contract, since it is sufficient to say that, whether we have regard to the history of the word as used in the various contracts, or give it its ordinary and well-accepted meaning, we shall arrive at the same conclusion as to the meaning of the word adverse to defendant's contention, and in favor of the meaning given to it by the plaintiff. It means exactly what the defendant himself said it meant, when, in the supplementary contract of 1889, he employed the word, "held" as synonymous with the word "reserve," as used in the original contract. Therefore, it will be seen that I have adopted as the meaning of the word "reserve," the one contended for by plaintiff.

Nor do I agree with the defendant's statement of law, wherein he asserts that the general rule is that an injunction will not be granted in aid of a contract for personal services. Whatever doubt may have existed in the past, it is now the settled law of England and America that where a person has entered into a definite contract to render services to another of such a nature as not to be easily replaced, and the loss of his services to the employer will be a loss not to be compensated for in damages, a breach or a threatened breach of such contract may be restrained by injunction. While a distinction is observed between affirmative and negative covenants in such an agreement, and while the court does not possess the power to compel a person to render services which he has agreed to perform, yet, when he has stipulated not to work for another, the court can and will, in a proper case, prevent his doing so. In England, since the decision in 1852 of the case of *Lumley* v. *Wagner*, 1 De Gex, M. & G. 604, such has been the law. In this country, endless citations of authorities might be resorted to to show that a similar principle of law prevails. In this state one of the leading cases is that of *Daly* v. *Smith*, 38 N. Y. Super. Ct. 158, 49 How. Pr. 150. In that case one Fanny Morant Smith had agreed to act during the seasons of 1874, 1875, and 1876. She broke this contract. A preliminary injunction was granted. A motion was made to continue it *pendente lite*. The learned justice, in delivering the opinion in that case, after an exhaustive examination of authorities which were ably collated and reviewed in his opinion, says: "The question whether or not a court of equity will interfere by injunction to prevent a breach of a contract for personal services, or whether the complainant must look to his damages at law as his sole redress, has been frequently and on several occasions quite elaborately discussed, both in England and in this country. On a cursory reading, the authorities may seem somewhat conflicting, but a careful perusal of them in the light of the facts before the court on the several occasions can leave no doubt as to the existence of the power." In another part of his opinion he says: "I am of the opinion that actors and actresses, like all other persons, should be held to a true and faithful performance of their engagements, and that whenever a court has not proper jurisdiction to enforce the whole engagement it should, like in all cases, operate to bind their consciences, at least as far as they can be bound, to a true and faithful performance." Quoting from another case, he continues: "The resort to actions at law for damages for a sudden desertion of the performers in the middle of their season will in most cases fail to afford adequate compensation; and it is not only that the manager is deprived of his means of carrying on business, but that his performers, by carrying their services to other establishments, deprive him of the fruits of his diligence and enterprise, increase rivalry against him, and cause him irreparable injury." Between an actor of great histrionic ability and a professional base-ball player, of peculiar fitness and skill to fill a particular position, no substantial distinction in applying the rule laid down in the cases cited can be made. Each is sought for his particular and peculiar fitness, each performs in public for compensation, and each possesses for the manager a means of attracting an audience. The refusal of either to perform

according to contract must result in loss to the manager, which is increased in cases where such services are rendered to a rival.

While, therefore, in a proper case the defendant is amenable to this rule of law, and the court has the power and right to prevent his breaking any covenant made not to give his services to another, it remains to be seen whether, upon the facts and proofs as they exist here, a case is presented for the intervention and exercise of the court's power during the pendency of the action. and before the rights of the parties are determined by the more deliberate proceeding of a trial. To quote from the opinion in *Murray* v. *Knapp*, 42 How. Pr. 462: "A plaintiff on an *ex parte* application at the beginning of his action has too often obtained a remedy which he should not have had until a hearing of both parties on the trial, and to which he might then have been found not to have been entitled. In many cases of this kind the plaintiff practically has obtained his judgment at the outset, and a continuance of the action has been only a struggle by the defendant to relieve himself of an *ex parte* decision." In the case of *Mapleson* v. *Del Puente*, 13 Abb. N. C. 144, which was brought by plaintiff, who was a manager of an operatic company, to restrain defendant, who was an operatic singer, the judge, in denying the application, says: "The granting of an injunction *pendente lite* is always in the discretion of the court, and should be ordered with caution and even with some reluctance, and only when the rights of the plaintiff on the law and the facts are clear, and the necessity for that form of equitable relief is manifest in order to prevent a failure of justice."

It will thus be seen that a court of equity is extremely loth, in cases of this kind, to not only practically decide and give judgment, but also to execute it, by enjoining the defendant before any trial upon the merits has been had. A preliminary injunction will not be granted except in cases where there is the strongest probability that the court will ultimately decide that plaintiff is entitled to the relief which it demands in its complaint. *Hamilton* v. *Transit Co.*, 3 Abb. Pr. 255. These cases, and many more that might be cited, hold that the granting of this extraordinary relief by way of preliminary injunction rests in the sound discretion of the court, and should not be granted except upon proof of facts and circumstances showing that a contract exists which is reasonably definite and certain, and that for a breach thereof no adequate remedy exists at law, and the probability of plaintiff's finally succeeding in the action is free from all reasonable doubt. It is insisted here, however, by the plaintiff that there exists a definite and reasonable contract, and that the probability of its succeeding finally is of the strongest and most certain kind. In examining into the claims thus made by plaintiff, and into the facts of this case, we must keep constantly in mind the distinction which exists between an action at law and suit in equity. As before said, this is a suit in equity wherein the court has no power to enforce the affirmative covenant claimed to exist, which would compel the defendant to play ball with plaintiff; but the court is asked, in effect, to decree the specific performance of a negative covenant, claimed to have been made by the defendant that he should not play ball with others. To determine whether or not the probability of its success in a final suit is of the strongest and most certain kind, certain questions must be determined.

Is there such a definite contract existing between the parties that it can be enforced? If sufficiently definite, is it entirely conscionable, wanting neither in fairness or mutuality? That a court of equity will not make a contract which the parties themselves have not made, and that it will not enforce an indefinite one, are elementary propositions that need no citation of authorities to support them. In the contract sued on, wherein defendant agrees to give his services for the ball season terminating October, 1889, we find the provision upon which it is admitted all plaintiff's right to succeed in this action depends. It reads as follows: "*Eighteenth.* It is further understood and

agreed that the said party of the first part shall have the right ' to reserve ' said party of the second part for the next season ensuing, the term mentioned in paragraph 2 herein provided; and said right and privilege is hereby accorded the said party of the first part, upon the following conditions, which are to be taken and construed as conditions precedent to the exercise of such extraordinary right or privilege, namely: *First.* That the said party of the second part shall not be reserved at a salary less than that mentioned in the 20th paragraph herein, except by consent of the party of the second part. *Second.* That the said party of the second part, if he be reserved by the said party of the first part for the next ensuing season, shall be one of not more than fourteen players then under contract." The only other provision bearing on this subject is that contained in the supplemental agreement, dated April 23, 1889, which reads as follows: "The New York Base-Ball Club agrees that John M. Ward, who this day signs a contract to play with it for the season of 1889, shall not be held by the New York Club for the season of 1890 at a salary of less than $3,000. This supplemental contract is hereby made a part of the main contract." These provisions of the main and supplemental contract quoted are all, and the only ones, relied upon by plaintiff to enforce which this action is brought.

Do these provisions constitute a definite contract between the parties, or do they do more than reserve the services of defendant, subject to the making of a contract thereafter, with definite terms and conditions? It must be noticed that these provisions, standing alone, fail to disclose what are to be the terms and conditions of the agreement between the parties in the event that plaintiff shall exercise its option, which is accorded, to reserve defendant for the ball season of 1890. What are the terms and conditions of the alleged agreement for the season of 1890 now sought to be enforced? What does the defendant, Ward, agree to do? What salary is to be paid him? Not only are there no terms and conditions fixed, but I do not think it is entirely clear that Ward agrees to do anything further than to accord the right to reserve him upon terms thereafter to be fixed. He does not covenant to make a contract for 1890 at the same salary, nor upon the same terms and conditions, as during the season of 1889. The provision relied upon as constituting the contract between the parties merely reserves Ward for 1890 at a salary of not less than $3,000. But how much more is he to receive? And in case of a dispute between the parties, how is the amount of salary to be determined? It is nowhere provided that the terms and conditions for 1890 are to be the same as those for 1889. As stated in Fry, Spec. Perf. p. 165, § 229: "It will be obvious that an amount of certainty must be required in the specific performance of a contract in equity greater than that demanded in an action for damages at law; for to sustain the latter proceeding the proposition required is the negative one that defendant has not performed the contract,—a conclusion which may be often arrived at without any exact consideration of the terms of the contract; whilst in equity it must appear not only that the contract has not been performed, but what is the contract which is to be performed."

The learned author, in a note to the section quoted, cites a number of cases which hold that, where the terms of a contract are indefinite or uncertain, specific performance will not be decreed. But it may be urged that the court should infer that it was the intent of the party that the terms and conditions should be the same. It is extremely doubtful if a court of equity would resort to any such inference or presumption for the purpose of first making a contract for the parties, and thereafter enforcing it. But assuming that the court would indulge in such an inference or presumption, what contract would the court require the defendant to perform? Will it be one under which he is to receive the same salary, and containing all the provisions including the reserve clause, *verbatim et literatim,* as in the contract of 1889? And upon

the defendant's refusal in 1891, will it under the reserve clause make a similar contract, and enforce it for that year, and thereafter from year to year as long as plaintiff elects to hold defendant? The failure in the existing contract to expressly provide the terms and conditions of the contract to be made for 1890 either renders the latter indefinite and uncertain, or we must infer that the same terms and conditions are to be incorporated in the one to be now enforced, which necessarily includes the reserve clause, for no good reason can be suggested, if all the others are to be included, why this should be omitted. Upon the latter assumption, the want of fairness and of mutuality, which are fatal to its enforcement in equity, are apparent, as will be seen when we consider to what extent, under such circumstances, each of the parties is bound. Every player who signs such a contract is bound for the current playing season and also for the ensuing playing season, and is obliged at the close of the first season to make another contract with the same terms and conditions binding him as before for the then approaching season, and reserving him for the second season, and so on as long as plaintiff elects; the player being always bound one year in advance. On the other hand, this contract, after having provided at paragraph 15 that the club might terminate the contract at any time because of a violation of the agreement by the player, it further provides, at paragraph 17, that the club may "at any time, by giving the party of the second part ten days' notice of its option and its intention so to do, end and determine all its liabilities and obligations under this contract, in which event, upon the expiration of said ten days, all liabilities and obligations undertaken by said party of the first part to this contract shall at once cease and determine, and said party of the second part shall thereupon be also free from his obligation thereunder, and shall have no claim for wages for any period after said ten days." So that the club may at any time, at the beginning, in the middle, or at the end of the playing season, when the player is in New York or San Francisco, or anywhere else, and without the assignment of any cause whatever, "determine all its liabilities and obligations under said contract," leaving the player to make his way home as best he can.

In thus considering the obligations which, under the plaintiff's construction of the contract, each has assumed, we have the spectacle presented of a contract which binds one party for a series of years and the other party for 10 days, and of the party who is itself bound for 10 days coming into a court of equity to enforce its claims against the party bound for years. In leases of property and in similar contracts clauses are frequently inserted giving options which can be enforced, but the distinction between such optional clauses in leases which have been upheld as fair and binding upon the parties to the covenant, and the one here sought to be enforced, is apparent when we remember that in the former instance mentioned, upon exercising the option a new and binding agreement is created, while in this case there is no obligation after the option is exercised, except for a period of 10 days. There is no obligation on the part of the club to pay the player any salary whatever for the second playing season. True, it is stated that he shall not be reserved at less than a certain salary. But the reserving club may easily dispose of this. It may wait until just before the second playing season opens, and, after every chance for a profitable engagement has passed by, then give the player 10 days' notice of its election to end and determine all its liabilities and obligations under the contract, and, as the playing season has not opened, the club would not even be obliged to pay the 10 days' salary. As stated by Fry, Spec. Perf. (New Ed.) § 286: "A contract, to be specifically enforced by the court, must be mutual; that is to say, such that it might at the time it was entered into have been enforced by either of the parties against the other of them. Whenever, therefore, whether from personal incapacity, the nature of the contract, or any other cause, the contract is incapable of being enforced against one party, that party is equally incapable of enforcing it against the

other." And, again, "A contract that is sought to be specifically enforced must be mutual both as to the remedy and the obligation. A party not bound by the agreement itself has no right to call upon a court of equity to enforce specific performance against the other contracting party by expressing his willingness in his bill to perform his part of the engagement. His right to the aid of the court does not depend upon his subsequent offer to perform the contract on his part, but upon its original obligatory character."

The application of these principles is well exemplified in the case of *Marble Co.* v. *Ripley*, 10 Wall. 339. That was a case of a contract in the nature of a partnership, by which the grantee of a marble quarry agreed to furnish all the marble the other party should require. In case of default by the grantee, the other party might enter and take out sufficient marble. The grantor or marble company was bound for all time. The right was reserved to grantee to terminate the contract at any time on one year's notice. The marble company asked for an injunction restraining Ripley, who denied there had been a default in furnishing marble, from entering and cutting out marble; and, *second*, for a cancellation of the contract. Ripley on his side asked for the specific performance of the contract. In disposing of Ripley's prayer for specific performance the United States supreme court said: "Another reason why specific performance should not be decreed in this case is found in the want of mutuality. Such performance by Ripley could not be decreed or enforced at the suit of the marble company, for the contract expressly stipulates that he may relinquish the business and abandon the contract at any time, on giving one year's notice. And it is a general principle that when, from personal incapacity, the nature of a contract, or any other cause, a contract is incapable of being enforced against one party, that party is equally incapable of enforcing it specifically against the other." See, also, *German* v. *Machin*, 6 Paige, 288, and *Woodward* v. *Harris*, 2 Barb. 429.

It will thus be seen that I do not fully concur in the claims made by plaintiff that the probability of finally succeeding is of the strongest and most certain kind. Upon either one or both of the grounds considered, but principally upon the ground that the contract is indefinite and uncertain, does there arise a serious doubt as to plaintiff being accorded upon the trial the relief asked for. However that may be, what was said by the learned judge in *Mapleson* v. *Del Puente*, *supra*, in denying a motion for a preliminary injunction, is applicable here: "This action is now at issue on the complaint and answer, and there is no reason why it should not be speedily tried, and the various questions of law and fact which arise in it be deliberately and finally disposed of." The plaintiff seeks by injunction to restrain the defendant from playing for other clubs during the season of 1890. The playing season of 1890 does not open until the middle of April. Before that time this action can be tried at the special term, and final judgment rendered. A final judgment before the playing season opens will secure every possible right of plaintiff. Thus plaintiff may have final judgment, if entitled thereto, at least one month before the act sought to be enjoined can be done. In denying, therefore, the motion for a preliminary injunction, it is entirely appropriate to quote from the language of the learned judge in *Van Veghten* v. *Howland*, 12 Abb. Pr. (N. S.) 461, wherein he says: "There is a distinction between a preliminary and a final injunction. * * * Looking back, then, at the settled rules of equity, we shall find that, while final injunctions are matters of right, preliminary injunctions are matters of discretion. * * * Their object is to prevent such acts during the litigation as would preclude the court from giving the plaintiff his remedy at the end. * * * When the plaintiff shows that he will be entitled to a final, it does not necessarily follow that he is entitled to a preliminary, injunction. Such an injunction should not be granted or sustained, unless without it the court could not, by its final judgment, do justice between the parties. * * * Where the preliminary injunction restrains

the defendant from doing the very acts to restrain which the final judgment is sought, then the plaintiff has practically succeeded without a trial, and at the very beginning of his case."

While, therefore, I think that this is not a case in which a preliminary injunction should be granted, it is proper that the rights of the parties should be determined by a trial before the ball season begins, and to that end, on application made, I shall assist in securing a speedy trial, upon which a final and deliberate judgment upon the rights of the parties can be pronounced. Ordered accordingly.