**NASSAU SPORTS, a limited partnership, Plaintiff,**

v.

**Garry PETERS et al., Defendants.**

**No. 72 C 1086.**

United States District Court, E. D. New York.

Dec. 21, 1972.

Roth, Carlson, Kwit, Spengler & Goodell, New York City, and Fritz,

Christ, O'Brien & Farrell, Mineola, N. Y., for plaintiff by J. Edward Meyer III, New York City (M. Halstead Christ, Mineola, N. Y., and Fred J. Halsey, Jr., New York City, of counsel).

Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for Garry Peters and Metropolitan Hockey Club, Inc. by Jay Topkis, New York City (Anthony M. Radice, New York City, of counsel).

Graubard, Moskovitz, McGoldrick, Dannett & Horowitz, New York City, for Charles L. Abrahams by Emanuel Dannett, New York City (Robert I. Gosseen, Everett A. Eisenberg, and Jack Weinberg, New York City, of counsel).

## MEMORANDUM DECISION AND ORDER

NEAHER, District Judge.

This case presents a local skirmish in the reported—and apparently well-financed—"war" [1] between the fledgling World Hockey Association (WHA) and the established National Hockey League (NHL) over rights to the exclusive services of talented professional hockey players formerly under contract with NHL teams. While professional baseball, football and, more recently, basketball have provided many chapters "in the history of contract jumping by famous American athletes," Erving v. Virginia Squires Basketball Club, 468 F.2d 1064 (2 Cir. 1972),[2] it remained for profes-

---

1. See "Exhibits to Defendants' Affidavits in Opposition to Motion for Preliminary Injunction", Exh. K.

2. Baseball: Cincinnati Exhibition Co. v. Marsans, 216 F. 269 (E.D.Mo.1914); Brooklyn Baseball Club v. McGuire, 116 F. 782 (E.D.Pa.1902); Metropolitan Exhibition Co. v. Ewing, 42 F. 198 (S.D.N.Y. 1890); Augusta Baseball Ass'n v. Thomasville Baseball Club, 147 Ga. 201, 93 S.E. 208 (1917); Cincinnati Exhibition Co. v. Johnson, 190 Ill.App. 630 (1914); American Base Ball and Athletic Exhibition Co. v. Harper, 54 Cent.L.J. 449 (Cir.Ct. of St. Louis, May 1902); American League Baseball Club of Chicago v. Chase, 86 Misc. 441, 149 N.Y.S. 6 (Sup. Ct. 1914); Metropolitan Exhibition Co. v.

Ward, 24 Abb.N.Cas. 393, 9 N.Y.S. 779 (Sup.Ct.1890); Philadelphia Ball Club, Ltd. v. Lajoie, 202 Pa. 210, 51 A. 973 (1902).

Football: Houston Oilers, Inc. v. Neely, 361 F.2d 36 (10 Cir.), cert. denied 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966); New York Football Giants, Inc. v. Los Angeles Chargers Football Club, Inc., 291 F.2d 471 (5 Cir. 1961); Detroit Football Co. v. Robinson, 186 F.Supp. 933 (E.D.La.), affd. 283 F.2d 657 (5 Cir. 1960); Los Angeles Rams Football Club v. Cannon, 185 F.Supp. 717 (S.D.Cal. 1960); Winnipeg Rugby Football Club, Ltd. v. Freeman, 140 F.Supp. 365 (N.D. Ohio 1955); Long Island American Ass'n Football Club, Inc. v. Manrodt, 23 N.Y.S. 2d 858 (Sup.Ct.1940); Dallas Cowboys

sional hockey to generate in one season a mass exodus of players from NHL to WHA clubs. As Judge Higginbotham found in his comprehensive opinion in Philadelphia World Hockey Club, Inc. [WHA] v. Philadelphia Hockey Club, Inc. [NHL], 351 F.Supp. 462 (E.D.Pa., 1972), for this season alone approximately 60 former NHL players signed up with WHA clubs.[3] The lure was, of course, offers of greatly increased compensation which in one instance approached the fantastic—a guaranteed bonus of $1,000,-000 in advance just for signing a contract.[4]

At issue in this action is the right to the exclusive services of defendant Garry Peters ("Peters"), one of the former NHL players who signed with the WHA.[5] The contesting clubs, plaintiff and defendant here, unlike their respective leagues, stand on a more equal footing. Plaintiff Nassau Sports, a New York limited partnership, is the owner of the newly-franchised New York Islanders Club in the NHL. It has just begun its first hockey season and plays its home games at the Nassau County Memorial Coliseum in Uniondale, Long Island. Defendant Metropolitan Hockey Club, Inc., a New Jersey corporation, is the owner of the newly-franchised New York Raiders club in the WHA. It, too, has just begun its first hockey season and has been playing its home games at

Madison Square Garden because no suitable facilities as yet exist in New Jersey where the club is based.

Plaintiff commenced this action in the New York Supreme Court, Nassau County, in August 1972, to enjoin Peters from playing hockey for defendant Metropolitan in breach of plaintiff's alleged contract rights to Peters' exclusive services. Defendants joined in removing the action to this court on the ground of diversity of citizenship and a subsequent motion by plaintiff to remand the action was denied. 352 F.Supp. 867.

Prior to removal of the action to this court, Supreme Court Justice Berman had granted an ex parte temporary restraining order which restrained Peters

from playing hockey or rendering any service of any kind in any capacity to the defendant, Metropolitan Hockey Club, Inc., or to any other professional hockey team other than the New York Islanders.[6]

After this court accepted jurisdiction, plaintiff applied for a preliminary injunction to continue the foregoing restraint pending final determination of the action. Defendants oppose that application and have counter-moved to vacate the temporary restraining order. Although these motions present somewhat different issues, the parties recognize that the determinative question is

Football Club, Inc. v. Harris, 348 S.W.2d 37 (Tex.Civ.App.1961).

Basketball: Haywood v. National Basketball Association, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971); Munchak Corp. v. Cunningham, 457 F.2d 721 (4 Cir. 1972); Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472 (9 Cir. 1969); Denver Rockets v. All-Pro Management, Inc., 325 F.Supp. 1049 (C. D.Cal.1971); Minnesota Muskies, Inc. v. Hudson, 294 F.Supp. 979 (M.D.N.C. 1969); Connecticut Professional Sports Corp. v. Heyman, 276 F.Supp. 618 (S.D. N.Y.1967); Lemat Corp. v. Barry, 275 Cal.App.2d 671, 80 Cal.Rptr. 240 (Ct. App.1969); Central New York Basketball, Inc. v. Barnett, 190 Ohio Op.2d 130, 181 N.E.2d 506 (Ohio Com.Pl.1961).

3. C.A. Nos. 72–166, 1807, 1902, 1906 and 1995, Finding No. 189, at 493. Some 140

additional players from the American, Central and Western minor leagues also made the jump. *Id.*

4. Judge Higginbotham in *Philadelphia World Hockey Club, supra,* found that in order to induce Bobby Hull "to disregard the 'reserve' clause in his contract with the Chicago Blackhawks covering the 1971–72 season, each member club of the WHA agreed to pay its pro rata share of a million-dollar bonus. . . ." Finding No. 183, at 492.

5. The other individual defendant, Charles L. Abrahams, is sued as the agent who induced Peters to breach his alleged contractual obligations to plaintiff.

6. See Exh. B annexed to defendants' petition for removal.

whether plaintiff has any rights to Peters' services which would warrant preliminary injunctive relief in light of defendants' defenses of antitrust illegality and the requirements for such relief.

Plaintiff's claim of exclusive contract rights to Peters' services is based upon the following substantially undisputed facts. Peters, a Canadian citizen and resident, is a veteran professional hockey player of considerable talent, who had been under contract during the 1971–72 playing season with the Boston Professional Hockey Association, Inc., of the NHL, familiarly known as the Boston Bruins. The contract he entered into in Massachusetts on October 1, 1971 is known as the "Standard Player's Contract" required under league by-laws to be used by all NHL clubs. Peters had signed similar contracts annually from his rookie days in 1963.[7]

The Bruins' contract specified that the Club "hereby employs the Player [Peters] as a skilled Hockey Player for the term of one year commencing October 1st, 1971–1972" at a salary of $20,000 plus certain conditional major league bonuses.[8] Peters played only part of that season with the Bruins, although he received his full salary. Due to a knee injury, he played most of the season with the Boston Braves of the American Hockey League (AHL), a minor hockey league farm club of the Bruins. Despite his injury he finished the season as "Most Valuable Player" in the AHL, scoring 39 goals and making 34 assists in 58 games.[9]

Plaintiff's relationship with Peters began in June 1972 while his contract with the Bruins was still in effect. Plaintiff having paid $6,000,000 for its newly-acquired NHL franchise thereby gained the right to staff its team with 21 players selected from the other member clubs through the operation of the NHL expansion draft system. Peters was among those drafted by plaintiff and on June 21, 1972 a formal assignment was executed by the Bruins transferring the rights to his services to plaintiff.[10] Although Peters was not a party to the assignment, his contract with the Bruins specifically provided for that eventuality as follows:

"11. It is mutually agreed that the Club shall have the right to sell, assign, exchange and transfer this contract, and to loan the Player's services to any other professional hockey club, and the Player agrees to accept and be bound by such sale, exchange, assignment, transfer or loan, and will faithfully perform and carry out this contract with the same purpose and effect as if it had been entered into by the Player and such other Club."

See n. 8, *supra*.

Peters learned quite promptly that he had been drafted by plaintiff and of the assignment of his contract. He acknowledges that

"[d]uring June and early July of 1972 I negotiated with the New York Islanders, specifically with William Torrey, the Islanders' General Manager, for the purpose of reaching a contract for my services for the 1972–1973 hockey season. Their highest salary offer during this time was $37,500." [11]

---

7. See Peters' player biography attached as part of Affidavit of William A. Torrey, dated Aug. 9, 1972, which is Exh. A to his supplemental affidavit, dated Sept. 8, 1972.

8. A copy of the complete contract is annexed as Exh. A to the Affidavit of Roy L. M. Boe.

9. Affidavit of Garry L. Peters, par. 3. See also "Raider Player Biographies" issued by defendant Metropolitan Hockey Club, Inc., annexed as Exh. A to Affidavit of William A. Torrey.

10. A copy of the assignment is annexed as Exh. B to Affidavit of Roy L. M. Boe.

11. Affidavit of Garry L. Peters, par. 4. Mr. Torrey avers he proposed that "Peters accept an agreement which would compensate him at an average of $40,000 annually, with a bonus schedule which approximately could add up to an additional $10,000 to his salary." See Exh. A annexed to Affidavit of William A. Torrey, and Exh. C annexed to Affidavit of Roy L. M. Boe.

On July 15, 1972, Peters signed a contract with defendant Metropolitan's New York Raiders to play hockey for three seasons at a progressive annual salary of $55,000, $60,000 and $65,000.[12] Although his Bruins' contract assigned to plaintiff remained in effect until at least September 30, 1972, Peters failed to report to plaintiff's training camp in Canada in early September as required by that contract. And, after signing with the Raiders, he participated in defendant Metropolitan's promotional activities in further breach of its provisions. Finally, in a separate agreement with defendant Metropolitan, he bound himself "not to execute or sign any contract with any other professional hockey club for his services during the term" of the New York Raiders' contract and agreed to accept service of process in New Jersey "in an injunction action which would preclude [him] from playing for any other hockey club during the term of this contract." See n. 12, *supra*.

Since Peters admittedly did not sign a new contract with plaintiff for the 1972–1973 season and the assigned Bruins' contract terminated on September 30, 1972, the first question requiring answer is whether any legally enforceable rights to his services were created which survived that termination. Plaintiff, estimating it paid about $300,000 for such rights,[13] insists that the Bruins' contract expressly so provided. Paragraph 17 of that contract, *supra* n. 8, reads in pertinent part:

"17. * * *

"The Player hereby undertakes that he will at the request of the Club enter into a contract *for the following playing season* upon the same terms and conditions as this contract save as to salary which shall be determined by mutual agreement. In the event that the Player and the Club do not agree upon the salary to be paid the matter shall be referred to the President of the League, and both parties agree to accept his decision as final." (Emphasis supplied.) [14]

The foregoing provision, commonly called the "reserve clause", plainly gives the "Club"—here plaintiff—an option to renew Peters' contract "for an additional year", as Peters concedes.[15] Although defendants object to the reserve clause as illegal and unenforceable on antitrust grounds hereinafter discussed, such options are not uncommon in personal services contracts, especially in the professional sports and entertainment fields.

While a promise to render personal services will not be specifically enforced by an affirmative decree, Restatement of Contracts § 379, it has long been settled that injunctive relief may be granted to restrain an employee's violation of negative covenants in a personal services contract and such enforcement has in fact been granted in numerous cases involving professional athletes. Long Island American Ass'n Football Club, Inc. v. Manrodt, 23 N.Y.S.2d 858 (Sup.Ct.1940); American League Baseball Club of Chicago v. Chase, 86 Misc. 441, 149 N.Y.S. 6 (Sup.Ct.1914); Metropolitan Exhibition Co. v. Ward, 24 Abb.N.Cas. 393, 9 N.Y.S. 779 (Sup.Ct. 1890). See also Munchak Corp. v. Cun-

---

12. A complete copy, captioned WHA "Uniform Player's Contract", with addendum, escrow agreement and supplemental letter agreement dated July 22, 1972 has been made part of the record with the respective parties' consent.

13. This figure was derived by dividing the $6,000,000 franchise payment by 21, the number of players plaintiff was supposed to obtain from the other NHL member clubs. See Exh. A, par. 2, annexed to Affidavit of William A. Torrey.

14. Such a dispute is no longer referred to the NHL president. Commencing with the current season and continuing through 1975 an independent arbitrator will decide such disputes under an agreement jointly worked out between club owners and player bargaining representatives. See Exh. F annexed to Affidavit of Roy L. M. Boe.

15. Affidavit of Garry L. Peters, par. 8(a).

ningham, 457 F.2d 721 (4 Cir. 1972); Washington Capitols Basketball Club, Inc. v. Barry, 419 F.2d 472 (9 Cir. 1969); Houston Oilers, Inc. v. Neely, 361 F.2d 36 (10 Cir.), cert. denied 385 U.S. 840, 87 S.Ct. 92, 17 L.Ed.2d 74 (1966). Moreover, no distinction has been drawn between enforcing the employment contract and enforcing the option clause. See Central New York Basketball, Inc. v. Barnett, 190 Ohio Op.2d 130, 181 N.E.2d 506 (Ohio Com.Pl.1961), and Dallas Cowboys Football Club, Inc. v. Harris, 348 S.W.2d 37 (Tex.Civ.App. 1961), granting enforcement of an option clause.[16]

The primary requisite for enforcing either the contract or the option clause is that the player be an athlete of exceptional talent. Winnipeg Rugby Football Club, Ltd. v. Freeman, 140 F. Supp. 365, 366–367 (N.D. Ohio 1955). See also Philadelphia Ball Club, Ltd. v. Lajoie, 202 Pa. 210, 51 A. 973 (1902); Central New York Basketball, Inc. v. Barnett, *supra*; Dallas Cowboys Football Club, Inc. v. Harris, *supra;* Restatement of Contracts, § 380(2)(d) and Comment (i). Recent decisions indicate that that requirement is met prima facie in cases involving professional athletes. *Brennan, supra* n. 16 at 70; Note, Reserve Clauses in Athletic Contracts, 2 Rutgers Camden L.J. 302, 318 (1970).

Here, defendants concede that Peters is a player of exceptional ability as declared in both contracts he signed.[17]

Another basic requirement for enforcement of contracts of the type involved here is mutuality of contract.[18] Although defendants' answer raises the question of mutuality of contract, that issue has not seriously been pressed, and no factual or legal basis for finding a lack of mutuality has been provided. Indeed the contract on its face affirmatively indicates grounds for finding such mutuality.

The foregoing principles make it plain that as a matter of general contract law plaintiff did obtain an option on Peters' services for the 1972–73 season which may be enforced negatively by injunction unless barred by (1) the law applicable to this particular contract or (2) defendants' defense of antitrust illegality.

Since jurisdiction is based upon diversity of citizenship, the court must look to the law of the forum—including its choice of law rules—to ascertain the law applicable to this contract action. Klaxon Co. v. Stentor Electric Mfg. Co., Inc., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). The Bruins contract with Peters assigned to plaintiff had exclusively Massachusetts con-

16. See also Note, Injunctions in Professional Athletes Contracts—An Overused Remedy, 43 Conn.B.J. 538, 539 (1969); Brennan, Injunction Against Professional Athletes Breaching Their Contracts, 34 Brooklyn L.Rev. 61, 71 (1967).

17. The Bruins' contract assigned to plaintiff expressly provides

"The Player represents and agrees that he has exceptional and unique knowledge, skill and ability as a hockey player, the loss of which cannot be estimated with certainty and cannot be fairly or adequately compensated by damages. The Player therefore agrees that the Club shall have the right, in addition to any other rights which the Club may possess, to enjoin him by appropriate injunction proceedings from playing hockey for any other team and/or for any breach of any of the other provisions of this contract."

An expanded version of the foregoing provision appears in Peters' WHA "Uniform Player's Contract" with defendant Metropolitan, n. 12 *supra*, par. 6.

18. Connecticut Professional Sports Corp. v. Heyman, 276 F.Supp. 618, 621 (S.D.N.Y. 1967); Brooklyn Baseball Club v. McGuire, 116 F. 782 (E.D.Pa.1902); Cincinnati Exhibition Co. v. Johnson, 190 Ill. App. 630 (1914); American Base Ball and Athletic Exhibition Co. v. Harper, 54 Cent.L.J. 449 (Cir.Ct. of St. Louis, May 1902); Long Island American Ass'n Football Club, Inc. v. Manrodt, 23 N.Y.S.2d 858 (Sup.Ct.1940); Metropolitan Exhibition Co. v. Ward, 24 Abb.N.Cas. 393, 9 N.Y.S. 779 (Sup.Ct.1890). See also Madison Square Garden v. Braddock, 90 F.2d 924, 937 (3 Cir. 1937).

tacts and contains no choice of law clause. Thus a New York State court would apply Massachusetts law to the substantive non-federal questions present. Auten v. Auten, 308 N.Y. 155, 124 N.E.2d 99 (1954). These questions, in particular, would include those relating to interpreting rights and obligations flowing from the contract. Cf. Washington Capitols Basketball Club, Inc. v. Barry, *supra*.

The court's research, necessarily preliminary at this stage, indicates that two approaches are utilized by Massachusetts courts in the construction and enforcement of contracts. First, where the validity of a contract has been controverted, the courts construe the contract in a manner favoring its validity. Berger v. Victory Realty Trust, 329 Mass. 74, 106 N.E.2d 429 (1952); Shayeb v. Holland, 321 Mass. 429, 73 N.E.2d 731 (1947); Mutual Paper Co. v. Hoague-Sprague Corp., 297 Mass. 294, 8 N.E.2d 802 (1937). Second, where an employment covenant is deemed to be overbroad in time or area, Massachusetts courts, unlike those in numerous jurisdictions, freely engage in redaction. Rather than wholly rejecting the overly broad covenant, they enforce it to an extent considered to be reasonable. Wrentham Co. v. Cann, 345 Mass. 737, 189 N.E.2d 559 (1963); Novelty Bias Binding Co. v. Shevrin, 342 Mass. 714, 175 N.E.2d 374 (1961); Cedric G. Chase Photographic Laboratories, Inc. v. Hennessey, 327 Mass. 137, 97 N.E.2d 397 (1951); New England Tree Expert Co., Inc. v. Russell, 306 Mass. 504, 28 N.E.2d 997 (1940).

If this view of the Massachusetts law is correct, it would seem to support rather than bar enforcement of plaintiff's option on Peters' services for the current year. Some confirmation of this may be found in the recent analogous case of Boston Professional Hockey Association, Inc. v. Cheevers, et al., 472 F.2d 127 (1 Cir., October 10, 1972), in which the Court of Appeals for the First Circuit remanded a District Court order denying the plaintiff NHL hockey club a preliminary injunction against the defection of two star players to WHA clubs in breach of their reserve clause option obligations. Boston Professional Hockey Association, Inc. v. Cheevers, 348 F.Supp. 261 (D. Mass., 1972). Both courts in *Cheevers* clearly assumed that the NHL standard player's contract could be viewed as valid and enforceable, aside from possible antitrust invalidity. The District Court, however, construed the employment contracts in suit as part of an integrated complex of "NHL constitutions, by-laws, and agreements" and concluded that the plaintiff club had not sustained its "burden of showing that there is a probability that this tangled web of legal instruments will not be found to restrain trade in professional hockey." [19] It further found that the plaintiff club had failed to show "a probability of irreparable harm if the injunctive relief is denied", 348 F.Supp. at 270.

The Court of Appeals, in remanding, disagreed with the latter conclusion, stating:

> We are, however, of the view that the plaintiff, both because damages other than monetary are at stake and because of the impossibility of demonstrating the extent of monetary damages, has made a sufficient demonstration that it would probably suffer irreparable damages.[20]

But of more significance to the present inquiry regarding Massachusetts law was that Court's directions to the District Court. Noting that views as to facts and legal issues had been argued on appeal which had not been presented to the District Court, the Court of Appeals specified three questions which clearly implied that the NHL standard player's contract could be viewed as sep-

19. Boston Professional Hockey Association, Inc. v. Cheevers, 348 F.Supp. 261, 267 (D.Mass., 1972).

20. Boston Professional Hockey Association, Inc. v. Cheevers, 472 F.2d 127, at 128. (1 Cir., October 10, 1972).

arable from the complex of league agreements and other alliances which might raise antitrust questions. Thus, "wholly apart from any antitrust issue and as a matter of contract law", the District Court, in summary, was ordered to consider (1) whether the defendant players were not bound by their 1971–1972 contracts (identical with the contract here) to arbitrate any 1972–1973 salary dispute; (2) whether other "legally relevant documents" (the three-year neutral arbitration agreement) did not place a time limit on the claimed unlimited option obligation; and (3) whether, if such a time limit did exist, the plaintiff hockey club would have a probability of success in proving the option restraint to be reasonable, n. 20 *supra* at 877.

■ In this case, it seems too clear for argument that Peters, in signing his Bruins contract for the 1971–72 season, legally created an option on his services in favor of the Bruins or assignee for at least "the following playing season", *i. e.*, this 1972–73 season. As already noted, *supra*, pp. 874–875, the only dispute between Peters and plaintiff related to salary—a dispute referable to arbitration under the contract. See n. 8, *supra*. Plaintiff undeniably was willing to proceed with arbitration.[21] In this Circuit an agreement to arbitrate is enforceable by injunction. Erving v. Virginia Squires Basketball Club, *supra*. Preliminary injunctive relief barring breach of the option *during this season*, subject to arbitration of any salary dispute, if necessary, would therefore clearly appear to be sanctioned unless "the intrinsic ille-

gality of the contract is so clear that enforcement would make a court party to the precise conduct forbidden by the law." Dickstein v. du Pont, 443 F.2d 783, 786 (1 Cir. 1971).

■ In opposing plaintiff's application, defendants contend primarily that the option or reserve clause in Peters' NHL employment contract is so much a part of NHL league agreements and conduct which violate the antitrust laws as to be wholly void and unenforceable. Attacking the structure of the NHL in general and the option clause in particular, they assert it "would be difficult to imagine a more perfect subject for the Sherman Act than the National Hockey League."[22] Unquestionably, as defendants point out, hockey, like other major professional sports except baseball, is "presumably" not exempt from the antitrust laws. Flood v. Kuhn, 407 U.S. 258, 282–283, 92 S.Ct. 2099, 32 L.Ed.2d 728 (1972). And if "beyond all question" the result of granting a preliminary injunction in this case "will be to give the aid of the court in making effective the illegal agreements that constituted the forbidden combination", Continental Wall Paper Co. v. Louis Voight & Sons Co., 212 U.S. 227, 261, 29 S.Ct. 280, 292, 53 L.Ed. 486 (1909), then plaintiff's application should be denied.

Defendants' challenge to the NHL reserve clause focuses essentially on the requirement that each time a player's employment contract is renewed for a year, he must give the club a renewal option for the following year, *i. e.*, accept "the same terms and conditions as this contract save as to salary."[23]

---

21. Affidavit of William A. Torrey, par. 6.

22. "Paragraph 17 . . . is part of an agreement in unreasonable restraint of trade, is the product of a combination and agreement in unreasonable restraint of trade and of a combination and conspiracy to monopolize, an attempt to monopolize, and a monopolization of professional and major league professional hockey, all in violation of the antitrust law; and accordingly, paragraph 17 is void and unenforceable." (Answer and Counterclaim, Defendant Peters, at 5.)

23. See n. 8 *supra*, Exh. A, par. 17.
While critical of the NHL reserve clause system for insuring player allegiance, the WHA has also devised a contract method for security against the league's loss of talented players after seasonal contracts expire. If a player does not agree to renew his contract with a club, the matter "automatically" goes to arbitration. If either club or player disagrees with the arbitrator's decision, the player "automatically" enters a "secondary draft" pool. Once there, "he may not sign a contract

Thus, defendants say, a perpetual option is created binding a player to the one NHL team for so much of his hockey-playing life as it elects to keep him. The inevitable effect, they argue, is to preclude anyone from ever bidding for such a player's services thereby effectively preventing and restraining competition in the business of major league professional hockey and thus insuring the NHL's alleged monopolization of that sport.

Plaintiff counters defendants' challenge by asserting that the claimed "perpetual" option on the clubs' terms is a thing of the past. It points to agreements negotiated on a collective bargaining basis between the NHL member clubs and the NHL Players' Association, of which defendant Peters was a member. Those agreements provide for a system of neutral arbitration of player salary disputes for the three-year period ending in 1975. Plaintiff maintains that the obigation of the NHL reserve clause must be deemed limited to that time period and subject to future collective bargaining when the arbitration agreement expires.[24]

For purposes of this application it is unnecessary to choose between these conflicting views of the duration of the NHL reserve clause. Even though granting a preliminary injunction against its enforcement, Judge Higginbotham nonetheless found that "[e]very major professional team sport utilizes some form of 'reserve' clause in its standard player's contract." *Philadelphia World Hockey Club, supra,* Finding No. 113, 351 F.Supp. at 486. That finding reflects the widespread recognition of the unique character of the business of professional sports and the need for some form of protective system to insure the recoupment of investments—often large—made both to develop and to acquire talented players. In Flood v. Kuhn, *supra,* where much evidence was introduced on this point, District Judge Cooper concluded that "the preponderance of credible proof does not favor elimination of the reserve clause." 316 F.Supp. 271, 276 (S.D.N.Y.1970). With the exception of plaintiff Flood himself, all the witnesses presented on his behalf agreed that some form of option clause was desirable in professional baseball. No professional sport more closely parallels baseball's operations than hockey. "For all practical purposes, the arguments advanced for and against baseball's practices apply equally to hockey, including the recognition by hockey players of the need for the reserve clause." Pierce, "Organized Professional Team Sports and the Antitrust Laws," 43 Cornell L.Q. 566, 600 (1958).

Certainly nothing said by the Supreme Court majority in Flood v. Kuhn, *supra,* or in any of the earlier professional sports cases decided by that Court, points to ultimate judicial condemnation of the reserve clause as an unreasonable restraint upon trade. Noting that despite the repeated introduction of remedial legislation, Congress had allowed baseball "to develop and to expand unhindered by federal legislative action", the Court in *Flood* "voiced a preference that if any change is to be made, it come by legislative action that, by its nature, is only prospective in operation." 407 U.S. at 283, 92 S.Ct. at

with any other club until he is drafted." If drafted and the player and new WHA club fail to reach an agreement by September 1st, the player then enters "a pool for a new secondary draft, the date of which will be determined by the League President." The player thus continues to remain tied to the WHA until the training season starts and must bear half the arbitration costs, which are to be deducted "from the first payment due the Player under the next contract he signs." See

WHA Uniform Player's Contract, n. 12 *supra,* par. 16.

24. Plaintiff also insists that except for the option clause, which the clubs and player representatives have laid to rest for three years, other provisions of the player contract are open to bargaining each year. Plaintiff's Memorandum of Law in Support of Its Motion for Issuance of Preliminary Injunction, at 11.

2112. Such observations hardly import judicial dissatisfaction but rather recognition of the active role Congress has played in specifically regulating certain aspects of major professional sports when considered necessary in the public interest.[25]

Aside from the prosecution of a long-planned but sudden broadscale antitrust litigation assault by the WHA on the NHL reserve clause,[26] defendants have come forward with no convincing evidence which places this breach of contract case within "the narrow scope in which the defense [of illegality] is allowed in respect of the Sherman Act." Kelly v. Kosuga, 358 U.S. 516, 520, 79 S.Ct. 429, 432, 3 L.Ed.2d 475, rehearing denied, 359 U.S. 962, 79 S.Ct. 796, 3 L. Ed.2d 769 (1959). The claim that the NHL reserve clause bars access to pools of professional player talent and makes it impossible for newcomers to effectively enter or compete in the business of major league professional hockey is refuted by the facts found in *Philadelphia World Hockey Club, supra.* The findings in that case disclose that the twelve

WHA member clubs (including defendant Metropolitan) who have just begun their operation were able in one season to sign a total of 345 hockey players. Of these approximately 60—less than 18%—had played for an NHL team during the 1971–72 season and were subject to the NHL reserve clause. Some 145 were not subject to any reserve clause and about 140 had played with minor league teams and were subject to reserve clauses in those contracts. As of November 8, 1972, of the 345 players signed, only five or six including Peters have been enjoined or restrained as a result of unilateral suits instituted by NHL clubs, although a number of other NHL clubs had sent letters to additional players threatening to enforce the terms of their contracts.[27]

■ In short, it appears to this court that defendant Metropolitan and the other WHA clubs made a calculated decision to risk possible enforcement of the NHL reserve clause and have in large measure succeeded. No good reason is shown why the continued success of that raiding tactic is of such para-

25. Thus Justice Blackmun noted in *Flood, supra* 407 U.S. at 281–282, 92 S.Ct., at 2111:

Legislative proposals have been numerous and persistent. Since *Toolson* [Toolson v. New York Yankees, 346 U.S. 356, 74 S.Ct. 78, 98 L.Ed. 64] more than 50 bills have been introduced in Congress relative to the applicability or nonapplicability of the antitrust laws to baseball. A few of these passed one house or the other. Those that did would have expanded, not restricted, the reserve system's exemption to other professional league sports. And the Act of September 30, 1961, Pub.L. 87–331, 75 Stat. 732, and the merger addition thereto effected by the Act of November 8, 1966, Pub.L. 89–800, § 6(b), 80 Stat. 1515, 15 U.S.C. §§ 1291–1295, were also expansive rather than restrictive as to antitrust exemption.

26. Judge Higginbotham found in *Philadelphia World Hockey Club, supra,* that since its formation in the summer of 1971 the WHA "and its member teams have planned to engage in antitrust litigation against the NHL and its member teams challenging the validity of the NHL

'reserve' clause . . . [but did not choose] to seek a declaratory judgment . . . before inducing NHL players to jump to the WHA and before making the financial investments necessary to establish a new league . . . [and] . . . did not seek preliminary relief from enforcement of the 'reserve' clause until September 18, less than a month before the opening of the WHA season." Findings Nos. 185–188, 351 F.Supp. at 493.

27. *Philadelphia World Hockey Club, supra,* Findings Nos. 189–99, 351 F.Supp. at 493–495.

Also noteworthy in this connection are Findings Nos. 29 and 30, at 472, which disclose that "[t]here are more than 50,000 amateur hockey players in Canada and the United States." In 1972, out of 7000 Canadian players who attained the age of 20 and were available in the NHL draft, only 152 were drafted and 45 successfully signed by NHL clubs. Any and all of the 50,000 players, including those drafted and not signed by an NHL club, the court found, "are available to play in the WHA or any other league."

mount public interest as to be preferred to contract rights legitimately acquired by this plaintiff for substantial consideration. Defendant Peters voluntarily accepted employment under the allegedly illegal contract when his playing talents had no other outlet. He raises the antitrust question only when it appears to be no longer in his economic interest to comply with his agreement. That was not heretofore regarded as a sufficient excuse for breach of contract and should not become so when the claimed illegality, if any, is clearly divisible from the personal services commitment made. Kelly v. Kosuga, *supra*; Dickstein v. du Pont, *supra*.

The balance of hardships tips decidedly toward the plaintiff in this case at this time. It has paid some $300,000 for the right to Peters' services for the current season and has demonstrated prima facie a contract right enforceable by injunction under applicable State and federal law. Peters was not free to offer his services to defendant Metropolitan for this season in disregard of his contractual commitment. Except for the decision in Philadelphia World Hockey Club, *supra*, hereinafter discussed, no showing has been made that injunctive enforcement of Peters' option obligation for this current season will give the court's aid and comfort to a combination and conspiracy in restraint of trade. If anything has been demonstrated by defendants it is that the complex antitrust questions they raise may take more than a year, even years, to resolve.[28] By that time the option season to which plaintiff is entitled under its assignment will have long expired and defendants will have had the benefit of rights which plaintiff made a substantial payment to acquire. Plaintiff clearly needs judicial assistance now; delay could forever deprive it of appropriate redress.

The preliminary injunction against enforcement of the NHL reserve clause granted in *Philadelphia World Hockey Club*, *supra*, does not bar injunctive relief to this plaintiff. *First*, Judge Higginbotham expressly excluded this case—which was then sub judice—from the scope of his ruling.[29]

*Second*, the group of cases consolidated before Judge Higginbotham were presented, in effect, as a major antitrust action by the WHA against the NHL on broad issues of alleged violation and injury. It is apparent from the court's opinion that only antitrust issues were considered. Unlike this diversity case for alleged breach of contract raising a defense of illegality on antitrust

28. For example, at the instance of all the WHA clubs, including defendant Metropolitan, an order was filed before the Judicial Panel on Multidistrict Litigation on October 24, 1972, directing a hearing on November 29, 1972, of their motions to transfer this and six other actions pending in other districts "to the District of Minnesota for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407." In Re Professional Hockey Antitrust Litigation, Docket No. 119. Plaintiff has opposed such transfer but no decision has as yet been rendered by the Judicial Panel. Although consolidated pretrial proceedings may expedite ultimate disposition of the issues, the applications also presage the intensive and extensive discovery generally employed in a major antitrust case.

29. "On procedural grounds Atlanta Hockey, Inc. and Nassau Sports, a Limited Partnership, owners of NHL teams in Georgia and New York were dismissed from C.A. 72–1661. . . . Thus as to C.A. 72–1661, this Order is not applicable to those two parties. There is a question of fact as to whether Atlanta and Nassau are actually parties of record in Civil Action 72–1906 (transferred on September 26, 1972 from the United States District Court for the Northern District of Illinois) and Civil Action No. 72–1996 (transferred on October 11, 1972 from the United States District Court for the Central District of California). However, they remain as named defendants in C.A. 72–1906 and counter-defendants in C.A. 72–1807. I reserve my ruling on the issue as to whether this Order is applicable to Atlanta and Nassau because of their membership in NHL and their status in C.A. 72–1906, 72–1995 and 72–1807." *Philadelphia World Hockey Club*, *supra*, 351 F.Supp. at 519, n. 57.

grounds, no questions of applicable State law had to be considered. In particular, no consideration was given to preserving *existing* contractual commitments with an individual club, as shown here, without doing violence to national antitrust policy by construing such property obligations as separable from league agreements and relationships which might offend that policy. Instead the one-year option commitment was obliterated as part of "the other numerous interlocking agreements the NHL has fashioned . . . to monopolize a hockey player's professional career." *Philadelphia World Hockey Club, supra,* 351 F.Supp. at 508. That approach is not consistent with Massachusetts law or the views indicated by the First Circuit in Boston Professional Hockey Association, Inc. v. Cheevers, *supra,* which presumably reflect that law.

 Nor is injunctive relief barred, as defendants contend, by the anti-injunction provisions of the Norris-La Guardia Act, 29 U.S.C. § 101 et seq. The controversy between plaintiff and Peters is not a labor dispute and does not involve a labor contract. That plaintiff asserts in its complaint that the neutral arbitration system for resolution of salary disputes between clubs and players was a "collective bargaining agreement" which governs each player's contract does not alter the legal nature of the contract. The contract is purely and simply one for unique personal services to be rendered by an individual, to which the Norris-La Guardia Act has no application. See Flood v. Kuhn, 316 F. Supp. 271, 280 n. 15 (S.D.N.Y.1970).

In sum, Peters' option commitment for the current season is held to be a clearly established contract right in favor of plaintiff which must prevail over unproved and questionable defensive claims that such an option violates the antitrust laws. Kelly v. Kosuga, *supra*; Dickstein v. du Pont, *supra.* The ele-

ments of irreparable harm to plaintiff are clearly present. Boston Professional Hockey Association, Inc. v. Cheevers, *supra*; see also Erving v. Virginia Squires Basketball Club, D.C., 349 F.Supp. 716, affd. 468 F.2d 1064 (2 Cir. 1972). Plaintiff is accordingly entitled to a preliminary injunction enjoining Peters pendente lite from playing professional hockey for anyone but plaintiff during the current hockey season and from rendering any professional services for anyone but plaintiff in that connection for the period to and including September 30, 1973.[30] Such injunction shall become effective upon the posting by plaintiff of approved security in the sum of $100,000.

The foregoing constitutes the findings of fact and conclusions of law of the court for purposes of Rule 52, F.R.Civ.P.

Settle order on notice.

---

**30.** Peters, should he elect to perform his option commitment to plaintiff, shall not be required to sign a contract for the current season which contains a further renewal option.